IN RE S.D.W.

[228 N.C. App. 151 (2013)]

_____

IN RE S.D.W.

No. COA12-1362

Filed 2 July 2013

1. **Appeal and Error—interlocutory orders and appeals—contested adoption—substantial right**

An interlocutory order in a contested adoption case was immediately appealable where the order concluded that the consent of the biological father was not required for the adoption to proceed. The order deprived the father of a substantial right in that any parental rights he may have had would be terminated if the adoption proceeded to final decree.

2. **Parties—intervention—adoption—biological father**

The trial court correctly concluded that a biological father was entitled to intervene in an adoption proceeding only if he established at a hearing that his consent was necessary for the adoption to proceed.

3. **Adoption—consent of biological father—not required**

The trial court correctly concluded that a biological father's consent to adoption was not required under N.C.G.S. § 48-3-601 where the father did not fit into any of the provisions of N.C.G.S. § 48-3-601. He had never married or attempted to marry the mother and had not supported the mother or child before the filing of the petition.

4. **Adoption—biological father—no knowledge of child's birth—assumption of parental responsibility—hearing**.

An adoption proceeding was remanded for a full hearing

IN RE S.D.W.

[228 N.C. App. 151 (2013)]

concerning whether a biological father, who did not know of his child's birth until after the petition was filed, grasped the opportunity to act as a parent when that opportunity appeared. A biological father in those circumstances who promptly takes steps to assume parental responsibility upon discovering the existence of the child develops a constitutionally protected interest sufficient to require his consent where the adoption proceeding is still pending.

Appeal by appellant-father from Orders entered 17 February 2012 by Judge Elizabeth T. Trosch in District Court, Mecklenburg County. Heard in the Court of Appeals 8 May 2013.

*Thurman, Wilson, Boutwell & Galvin, P.A. by W. David Thurman, for petitioner-appellee.*

*Jonathan McGirt, for appellant-father Gregory Johns.*

STROUD, Judge.

Gregory Johns ("father") appeals from orders entered 17 February 2012 denying his motion to intervene in the adoption proceedings concerning his biological son, denying his motion to dismiss the adoption petition, and granting the adoptive parents' ("petitioners") motion for summary judgment on the issue of whether father's consent was required for the adoption.

For the following reasons, we hold that N.C. Gen. Stat. § 48-2-601 may be unconstitutional as applied to father if he can show that he promptly attempted to grasp the opportunity of fatherhood once he discovered his son's existence, but the statute foreclosed that opportunity. We therefore reverse the trial court's orders granting petitioners' motion for summary judgment and denying his motion to intervene. Because there are factual issues that this Court cannot resolve, we remand this case to the trial court with instructions to conduct a hearing on that issue and enter an order with appropriate findings of fact and conclusions of law.

I. Background and Procedural History

Father dated the mother ("mother") of his biological son from approximately May 2009 to February 2010. During that time, they engaged in sexual intercourse. They broke up around February 2010, but continued engaging in sexual intercourse for several weeks. After about March 2010, mother and father stopped communicating with each

**IN RE S.D.W.**

[228 N.C. App. 151 (2013)]

other until around 26 November 2010. There is no evidence that either mother or father attempted to communicate with each other during this time period. After they stopped dating, father continued to live and work at the same place at which he had previously lived and worked and his contact information, including his phone number, remained the same.

Mother gave birth to a baby boy ("Sean")[1] on 10 October 2010 in New Hanover County. Mother relinquished custody of Sean to Christian Adoption Services (CAS), an adoption agency in Mecklenburg County. The adoption agency interviewed mother and inquired about Sean's biological father. Mother told the agency that she did not know the address or phone number of father and had no way to contact him. She misidentified Sean's father as "Gregory Thomas James," rather than "Johns." The agency searched for "Gregory James," but did not find him.

CAS found a married Mecklenburg County couple interested in adopting Sean. They filed a petition to adopt Sean on 2 November 2010. Along with the adoption petition, the adoptive parents filed an Affidavit of Parentage, which again stated the biological father's name as Gregory James. Because the true identity of Sean's biological father was unknown to CAS and because they could not find "Gregory James," the agency filed a petition to terminate the father's rights on 16 November 2010 and stayed the adoption proceeding.

Around 20 April 2011, father learned through an acquaintance that mother may have been pregnant and had a baby that she placed for adoption. Father called mother around 25 April 2011 to ask her whether she had been pregnant. After initially denying the pregnancy, mother admitted that she had given birth to a baby and placed him for adoption. Mother gave father the information with which to contact CAS.

After mother called CAS to inform them of father's true identity and father got in contact with CAS, petitioners voluntarily dismissed the petition to terminate the parental rights of "Gregory James" on 2 May 2011 and removed the stay from the adoption proceeding on 5 May.

On 11 May 2011, notice of the adoption proceedings was served on Kyle Johns, Gregory Johns' brother. On 24 May 2011, father, *pro se*, responded to the notice and sent letters to the Mecklenburg County Clerk of Superior Court and to counsel for petitioners inquiring what he had to do to acquire custody, requesting a DNA test to prove that Sean

---

1. To protect the identity of the minor child and for ease of reading we will refer to him by pseudonym.

**IN RE S.D.W.**

[228 N.C. App. 151.(2013)]

was his biological son, and asking that once the DNA test showed him to be the biological father the adoption proceeding be terminated.

On 9 June 2011, counsel for petitioners noted their intent to take father's deposition. On 23 June 2011, father, still *pro se*, was deposed by counsel for petitioners. In his deposition, father described his educational and employment background, his relationship with mother, and how he came to discover Sean's existence. On 24 June 2011, counsel for petitioners sent father the results of his DNA test, which showed that there was a 99.99% probability that he was Sean's biological father.

On 15 August 2011, father, now represented by counsel, moved to intervene, moved for disclosure of the adoption file, moved to dismiss the petition for adoption, petitioned to legitimate the child, and moved for custody.

Petitioners responded to father's motions and moved for summary judgment on the issue of whether his consent was required for the adoption to proceed. The District Court held a hearing on 24 October 2011 where it considered father's motion to intervene and motion for disclosure of the adoption file. On 10 November 2011, the trial court entered an order denying father's motion to intervene and allowing his motion for disclosure of the adoption file, with some limitations.[2]

The District Court then held a hearing on the remaining motions on 6 January 2012.[3] At the hearing, the court heard argument from father and petitioners on the motion for summary judgment, granted the motion, and then heard testimony from father relating to his motion to dismiss. The trial court also denied father's motion to dismiss the adoption petition. On 17 February 2012, the trial court entered one order amending its 10 November order and a second order making findings of fact and conclusions of law about the motions considered at the January hearing. In those orders, the court denied father's motion to intervene

---

2. Father voluntarily dismissed his petition to legitimate Sean on 10 October 2011.

3. The trial court did not consider father's motion for custody—it had not been noticed for hearing and the court had already denied father's motion to intervene. We also note that on 4 January 2012, father commenced an action for custody of Sean pursuant to N.C. Gen. Stat. § 50-3.1 (2011) and requested an injunction against petitioners in this case preventing them from proceeding with the adoption. On 10 January 2012, petitioners herein moved to dismiss the Chapter 50 custody action for lack of subject matter jurisdiction under N.C. Gen. Stat. § 1A-1, Rule 12(b)(1) (2011), and failure to state a claim under Rule 12(b)(6), due to the prior pending adoption proceeding. We have addressed the Chapter 50 custody proceeding in *Johns v. Welker*, ___ N.C. App. ___, ___ S.E.2d ___ (2013) (2 July 2013) (No. COA12-1154).

and granted petitioner's motion for summary judgment on the basis that father's consent was not required for the adoption to proceed. Father filed timely written notice of appeal from these orders on 14 March 2012.

## II. Appellate Jurisdiction

**[1]** As father acknowledges, this appeal is from an order that is not a final judgment since it does "not dispose of the case, but instead leave[s] it for further action by the trial court in order to settle and determine the entire controversy." *Turner v. Hammocks Beach Corp.*, 363 N.C. 555, 558, 681 S.E.2d 770, 773 (2009) (citation and quotation marks omitted). Therefore, it is interlocutory. *Id.* Normally, interlocutory orders are not immediately appealable. *Id.* Nonetheless, an interlocutory order may be immediately appealed if it affects a substantial right. *Id.* "Essentially a two-part test has developed [to determine whether an interlocutory order affects a substantial right]—the right itself must be substantial and the deprivation of that substantial right must potentially work injury to [the appellant] if not corrected before appeal from final judgment." *Goldston v. American Motors Corp.*, 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990) (citation omitted).

As will be described below, the order deprives father of the right to participate in the adoption proceeding concerning his biological child by concluding that his consent is not required for the adoption to proceed. Such a right is substantial. If the adoption proceeds to a final decree of adoption, any parental rights that father may have had would be terminated. N.C. Gen. Stat. § 48-1-106(c) (2011). Moreover, the adoption statute severely limits the avenues for challenging a final decree of adoption through appeal. N.C. Gen. Stat. § 48-2-607 (2011). Therefore, deprivation of the right to consent in this context could work irreparable damage to father's rights. Indeed, petitioners do not contest this issue. We conclude that the order at issue here affects a substantial right and is immediately appealable. Therefore, we have jurisdiction to consider the present appeal.

## III. Standard of Review

Father appeals from orders denying a motion to dismiss, denying a motion to intervene, and granting a motion for summary judgment. The issue on appeal as to all of the motions is whether the trial court properly concluded that father's consent was not required under the adoption statutes and under the state or federal constitutions and whether the trial court properly interpreted the statutes at issue. Thus, the appeal from each order presents solely a question of law, which we review *de novo*. *City of Wilmington v. Hill*, 189 N.C. App. 173, 176, 657 S.E.2d 670, 672 (2008).

IV. Intervention

**[2]** Adoption is a special proceeding before the clerk of superior court. N.C. Gen. Stat. § 48-2-100(a) (2011). Special proceedings are governed by the Rules of Civil Procedure "except as otherwise provided." N.C. Gen. Stat. § 1-393 (2011). Thus, where the adoption statutes provide a procedure different than that set out in the Rules of Civil Procedure, the adoption statutes govern. *See* N.C. Gen. Stat. § 1A-1, Rule 1 (2011) (stating that the Rules of Civil Procedure apply "except when a differing procedure is prescribed by statute.").

Intervention of right under N.C. Gen. Stat. § 1A-1, Rule 24, is permitted

> (1) When a statute confers an unconditional right to intervene; or (2) When the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

N.C. Gen. Stat. § 1A-1, Rule 24(a) (2011). Once an intervenor becomes a party, he is entitled to participate as fully as any other party. *Harrington v. Overcash*, 61 N.C. App. 742, 744, 301 S.E.2d 528, 529 (1983).

The adoption statutes, however, define specifically who a party is and how non-parties are entitled to participate. A party to an adoption proceeding is defined as "a petitioner, adoptee, or any person whose consent to an adoption is necessary under this Chapter but has not been obtained." N.C. Gen. Stat. § 48-1-101(11)(2011). Some people not included as a party are nonetheless entitled to notice. *See* N.C. Gen. Stat. § 48-2-401 (2011). "Except as provided in G.S. 48-2-206(c), 48-2-206(d), and 48-2-207(d), a person entitled to notice whose consent is not required may appear and present evidence only as to whether the adoption is in the best interest of the adoptee." N.C. Gen. Stat. § 48-2-405 (2011).

Section 48-2-207(d), in turn, provides, "If the court determines that the consent of any individual described in G.S. 48-2-401(c)(3) is not required, such individual shall not be entitled to receive notice of, or participate in, further proceedings in the adoption." N.C. Gen. Stat. § 48-2-207(d) (2011). Thus, a person whose consent is not required is not a party, and if that person is described in section 48-2-401(c)(3), he is not entitled to appear and present best interest evidence, even if he was entitled to notice.

Section 48-2-401(c)(3) requires the petitioner to give notice to

> [a] man who to the actual knowledge of the petitioner claims to be or is named as the biological or possible biological father of the minor, and any biological or possible biological fathers who are unknown or whose whereabouts are unknown, but notice need not be served upon a man who has executed a consent, a relinquishment, or a notarized statement denying paternity or disclaiming any interest in the minor, a man whose parental rights have been legally terminated or who has been judicially determined not to be the minor's parent, or, provided the petition is filed within three months of the birth of the minor, a man whose consent to the adoption has been determined not to be required under G.S. 48-2-206.

N.C. Gen. Stat. § 48-2-401(c)(3)(2011).

Reading these statutes together, it becomes clear that a putative father whose consent is not required for the adoption is neither a party nor entitled to appear and present best interest evidence. By contrast, if a putative father's consent is required, he is a party and entitled to fully participate in the adoption proceeding. To determine whether a putative father who has been served notice and timely responded or who has intervened in the adoption proceeding is entitled to consent, the trial court must hold a hearing under N.C. Gen. Stat. § 48-2-207 (2011).

Thus, a putative father in Mr. Johns' position is entitled to have the trial court determine whether his consent is required and present evidence concerning that question. If the trial court determines that his consent is not required, he is not entitled to intervene or participate in any further capacity in the adoption proceeding. Therefore, although the language of the 10 November order was slightly confusing in that it could be read to deny father the right to have the issue of consent determined, the trial court correctly concluded that "[t]he father is entitled to intervene in this action as a party only if he establishes that his consent is necessary for this adoption to proceed" and held a hearing to determine whether his consent was, in fact, required.

### V. Necessity of Father's Consent

**[3]** Father first argues that the trial court erred in concluding that his consent was not required under N.C. Gen. Stat. § 48-3-601. We hold that the trial court correctly interpreted N.C. Gen. Stat. § 48-3-601 in concluding that his consent was not required.

**IN RE S.D.W.**

[228 N.C. App. 151 (2013)]

In North Carolina, all necessary consents must have been obtained in order for a trial court to grant an adoption petition. N.C. Gen. Stat. § 48-2-603(4) (2011). The consent of a man "who may or may not be the biological father of the minor" is required if he

1. Is or was married to the mother of the minor if the minor was born during the marriage or within 280 days after the marriage is terminated or the parties have separated pursuant to a written separation agreement or an order of separation entered under Chapters 50 or 50B of the General Statutes or a similar order of separation entered by a court in another jurisdiction;

2. Attempted to marry the mother of the minor before the minor's birth, by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid, and the minor is born during the attempted marriage, or within 280 days after the attempted marriage is terminated by annulment, declaration of invalidity, divorce, or, in the absence of a judicial proceeding, by the cessation of cohabitation;

3. *Before the filing of the petition,* has legitimated the minor under the law of any state;

4. *Before the earlier of the filing of the petition or the date of a hearing under G.S. 48-2-206,* has acknowledged his paternity of the minor and

    I.   Is obligated to support the minor under written agreement or by court order;

    II.  Has provided, in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor, or both, which may include the payment of medical expenses, living expenses, or other tangible means of support, and has regularly visited or communicated, or attempted to visit or communicate with the biological mother during or after the

**IN RE S.D.W.**

[228 N.C. App. 151 (2013)]

term of pregnancy, or with the minor, or with both; or

III. After the minor's birth but before the minor's placement for adoption or the mother's relinquishment, has married or attempted to marry the mother of the minor by a marriage solemnized in apparent compliance with law, although the attempted marriage is or could be declared invalid; or

5. *Before the filing of the petition,* has received the minor into his home and openly held out the minor as his biological child; or

6. Is the adoptive father of the minor . . . .

N.C. Gen. Stat. § 48-3-601(2)(b) (emphasis added).

Mr. Johns argues that § 48-3-601 does not apply to him because § 48-3-603 is contrary to § 48-3-601 and more specific. We disagree.

Under N.C. Gen. Stat. § 48-3-603, "[c]onsent to an adoption of a minor is not required of a person or entity whose consent is not required under G.S. 48-3-601" or if one of eight categories applies. Reading these statutes together, it is clear that consent is only required of a person or entity listed in § 48-3-601. Even if a person or entity qualifies under § 48-3-601, however, his consent is not required if one of the § 48-3-603 categories applies. None of those categories applies here. Therefore, the only question is whether Mr. Johns' consent is required under § 48-3-601(2)(b).

The record shows, and the trial court found, that there was no genuine issue about the fact that Mr. Johns does not fit into any of the provisions of N.C. Gen. Stat. § 48-3-601. He has never married or attempted to marry the mother and had not supported mother or the minor child before the filing of the petition. Indeed, he did not become aware of the child's existence until after the petition had already been filed. Therefore, the trial court correctly concluded that his consent is not required under the statute.

VI. Due Process Claim

[4] Mr. Johns argues that applying N.C. Gen. Stat. § 48-3-601 to him under the facts disclosed in the present record violates his due process rights under the 14th Amendment to the United States Constitution and

IN RE S.D.W.

[228 N.C. App. 151 (2013)]

Article I, Section 19 of the North Carolina Constitution. We agree that the application of the statute to Mr. Johns would violate his constitutional rights if the facts are as he alleges them. We cannot, however, find facts ourselves and must remand to the trial court for findings relevant to this issue.

The Fourteenth Amendment forbids "any state [from] depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const., amend. XIV. Similarly, Article I, Section 19 of the North Carolina Constitution states that "No person shall be . . . in any manner deprived of his life, liberty, or property, but by the law of the land." N.C. Const. art. I, § 19. "The 'law of the land' clause has the same meaning as 'due process of law' under the Federal Constitution." *Summey Outdoor Advertising, Inc. v. County of Henderson*, 96 N.C. App. 533, 541, 386 S.E.2d 439, 444 (1989), *disc. rev. denied*, 326 N.C. 486, 392 S.E.2d 101 (1990).

"In general, substantive due process protects the public from government action that unreasonably deprives them of a liberty or property interest. If that liberty or property interest is a fundamental right under the Constitution, the government action may be subjected to strict scrutiny." *Toomer v. Garrett*, 155 N.C. App. 462, 469, 574 S.E.2d 76, 84 (2002) (citations omitted), *app. dismissed and disc. rev. denied*, 357 N.C. 66, 579 S.E.2d 576 (2003). "Substantive due process protection prevents the government from engaging in conduct that . . . interferes with rights implicit in the concept of ordered liberty." *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998) (citations and quotation marks omitted). "Applying the Due Process Clause is . . . an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake." *Lassiter v. Department of Social Services of Durham County, N. C.*, 452 U.S. 18, 24-25, 68 L.Ed. 2d 640, 648 (1981).

"The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by" the United States Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65, 147 L.Ed. 2d 49, 56 (2000); *see Santosky v. Kramer*, 455 U.S. 745, 758-59, 71 L.Ed. 2d 599, 610 (1982) ("[A] natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right." (citation and quotation marks omitted)). The question in this case is whether that right applies to Mr. Johns under the facts of this case. Stated otherwise, has he acted

inconsistently with the protected rights of a natural parent? *See Price v. Howard,* 346 N.C. 68, 83-84, 484 S.E.2d 528, 537 (1997).

The United States Supreme Court and the courts of this State have wrestled with the question of whether an unmarried biological father has a protected constitutional interest in the care and custody of his child.

In *Lehr v. Robertson,* the United States Supreme Court considered "whether New York has sufficiently protected an unmarried father's inchoate relationship with a child whom he has never supported and rarely seen in the two years since her birth." *Lehr v. Robertson,* 463 U.S. 248, 249-50, 77 L.Ed. 2d 614, 619 (1983). The biological father in that case "had lived with [the mother] prior to Jessica's birth and visited her in the hospital when Jessica was born, but his name [did] not appear on Jessica's birth certificate." *Id.* at 252, 77 L.Ed. 2d at 620. Despite being aware of Jessica's birth, the biological father "did not live with [the mother] or Jessica after Jessica's birth, he has never provided them with any financial support, and he has never offered to marry [Jessica's mother]." *Id.* at 252, 77 L.Ed. 2d at 621.

The Court "noted that the rights of the parents are a counterpart of the responsibilities they have assumed." *Id.* at 257, 77 L.Ed. 2d at 624. On that ground, the Court distinguished "between a mere biological relationship and an actual relationship of parental responsibility." *Id.* at 259-60, 77 L.Ed. 2d at 625. Further, the Court expressly approved of Justice Stewart's observation that "[p]arental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." *Id.* at 260, 77 L.Ed. 2d at 626 (citation, quotation marks, and emphasis omitted).

The Court went on to state,

> When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the due process clause. At that point it may be said that he acts as a father toward his children. But the mere existence of a biological link does not merit equivalent constitutional protection. The actions of judges neither create nor sever genetic bonds. The importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and

> from the role it plays in promoting a way of life through the instruction of children as well as from the fact of blood relationship.
>
> . . . .
>
> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Id.* at 261-62, 77 L.Ed. 2d at 626-27 (citations, quotation marks, ellipses, and footnote omitted). The Court concluded that the New York statutes "adequately protected [his] inchoate interest in establishing a relationship with Jessica." *Id.* at 265, 77 L.Ed. 2d at 629.

The decision in *Lehr* hinged on the failure of the biological father to grasp the opportunity to develop a relationship with his daughter. The Supreme Court recognized that even if a biological father has not developed a relationship with his child so as to warrant "full-blown" parental rights, an unwed biological father has an interest in *the opportunity* to develop such a relationship—an "inchoate interest." *See id.* at 262, 265, 77 L.Ed. 2d at 627, 629. Further, the Court noted that "[t]here [was] no suggestion in the record that [the mother-petitioner and her husband] engaged in fraudulent practices that led [the biological father] not to protect his rights." *Id.* at 265, 77 L.Ed. 2d at 629 n.23.

In *Michael H. v. Gerald D.*, the United States Supreme Court reflected on its opinion in *Lehr* and noted that it had "observed that the significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring *and we assumed that the Constitution might require some protection of that opportunity.*" 491 U.S. 110, 128-29, 105 L.Ed. 2d 91, 109 (1989) (emphasis added). Yet, the Supreme Court has never defined the "inchoate interest" a biological father has in the opportunity to develop a relationship with his child.

The courts of this State have also not directly addressed this issue. Although father relies heavily on our Supreme Court's decision in

IN RE S.D.W.

[228 N.C. App. 151 (2013)]

*Petersen v. Rogers*, 337 N.C. 397, 445 S.E.2d 901 (1994), *Price* made clear that the presumption referred to in *Petersen* is not applicable if a parent's "conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child." *Price*, 346 N.C. at 79, 484 S.E.2d at 534.

In *Price*, an unmarried mother had been sued for custody of her minor child by a man whom she had led to believe was the natural father of the child and who had acted as such, but who was not in fact the child's natural father. *Id.* at 71-72, 484 S.E.2d at 529-30. The trial court had awarded custody to the defendant-mother because of her paramount status as a natural parent, though it found that it was in the child's best interest for custody to be placed with the plaintiff. *Id.* at 72, 484 S.E.2d at 530. The Court, citing *Lehr*, held that "[a] parent may no longer enjoy a paramount status if his or her conduct is inconsistent with this presumption or if he or she fails to shoulder the responsibilities that are attendant to rearing a child." *Id.* at 79, 484 S.E.2d at 534. Thus, our Supreme Court in *Price* placed the father's failure to grasp the opportunity to develop a relationship with his child in *Lehr* as one of those ways in which a natural parent may act inconsistently with his otherwise constitutionally protected status and thereby lose his parental rights. *See id.*

This Court has also considered similar issues. In *In re Adoption of Baby Girl Dockery*, we considered an equal protection and due process challenge to former N.C. Gen. Stat. § 48–6(a)(3) (1984), which only required the consent of an unmarried biological father to adoption if paternity had been judicially established, if he had acknowledged the child, or if he had financially supported and cared for the child and the mother. 128 N.C. App. 631, 633-34, 495 S.E.2d 417, 419 (1986). After a very brief analysis of the substantive due process issue, we concluded that the biological father had not established a protected relationship with his child. *Id.* at 635-36, 495 S.E.2d at 420. As appellees have highlighted, in considering the equal protection argument, we discounted the fact that the father was unaware of the child's existence. *Id.* at 634, 495 S.E.2d at 419. There was, however, no discussion in *Dockery* of what interest a biological father has in the opportunity to develop a relationship with his child.

*Dockery* is distinguishable from the present case. In *Dockery*, the biological father learned of the child's existence when the adoption agency contacted him and asked for his consent, approximately one month *prior* to the adoption petition being filed. *Id.* at 632, 495 S.E.2d at 418. Thus, under the facts of that case, the biological father had an opportunity, albeit a limited one, to develop a protected relationship

with his child by pursuing one of the methods outlined in the consent statute before the filing of the petition. He simply failed to grasp the opportunity in time.

The other North Carolina cases relied on by the parties are either no longer good law, *e.g.*, *In re Adoption of Clark*, 95 N.C. App. 1, 381 S.E.2d 835 (1989), *rev'd*, 327 N.C. 61, 393 S.E.2d 791 (1990), or address issues of statutory interpretation without reaching the constitutional issue under consideration here, *e.g.*, *In re Adoption of Byrd*, 354 N.C. 188, 194-98, 552 S.E.2d 142, 147-49 (2001) (considering whether a biological father's consent was required under the statute), *A Child's Hope, LLC v. Doe*, 178 N.C. App. 96, 105-06, 630 S.E.2d 673, 678-79 (2006) (deciding that a father's parental rights could be terminated under the statute even though the mother lied to him about the existence of the child), *and In re T.L.B.*, 167 N.C. App. 298, 303, 605 S.E.2d 249, 252-53 (2004) (affirming the trial court's decision to terminate a biological father's parental rights under the statute even though he only failed to protect his rights because he did not know of the child's existence). No North Carolina case has addressed the constitutional question presented here under similar facts. Some of our sister states have, however, confronted similar constitutional issues.

In *In re Adoption of A.A.T.*, 196 P.3d 1180 (Kan. 2008), *cert. denied*, ___ U.S. ___, 173 L.Ed. 2d 1088 (2009), the Kansas Supreme Court considered an adoption case in which the mother had lied to the child's biological father about her pregnancy and to the court about the biological father's identity. In that case, the father knew that the mother had become pregnant, but the mother then "took extraordinary measures to prevent [the biological father] from knowing about the birth of his child," including lying to him about having had an abortion, and submitted an affidavit in which she lied about the last name of the child's putative father. *Id.* at 1185, 1188. Because the putative father could not be found (using the false last name), the adoption agency published newspaper notice to the father under the false name. *Id.* at 1186. When no father appeared in response to the notice, the court terminated the father's rights and finalized the adoption. *Id.* After six months, the mother told the biological father the truth and within six weeks he retained counsel and moved to set aside the adoption decree. *Id.*

In its review of cases from other states, the Kansas court noted that

> the cases conclude that as long as the state's statutes provide a process whereby most responsible putative fathers can qualify for notice in an adoption proceeding, the

interests of the State in the finality of adoption decrees, as discussed in *Lehr*—providing a child stability and security early in life, encouraging adoptions, protecting the adoption process from unnecessary controversy and complication, and protecting other parties' privacy and liberty interests—justify a rule that a putative father's opportunity to develop a parenting relationship ends *with the finalization of a newborn child's adoption* even if the reason the father did not grasp his opportunity was because of the mother's fraud.

*Id.* at 1196 (emphasis added).

After lengthy analysis of the underlying constitutional principles, the Kansas Supreme Court concluded, over three dissents, that the father did not have a protected liberty interest because he failed to take any steps to protect his rights, such as filing a notice with the putative father registry immediately upon learning that the mother was pregnant, before she lied to him about having an abortion. *Id.* at 1195-96, 1203. The court reasoned that "the opportunity to assert his interest in parenting slipped away without any involvement of the State. The interests of the State and the adoptive family justify a conclusion that [the father's] opportunity to demonstrate his commitment to parenting passed without developing into a liberty interest." *Id.* at 1203.

New York appellate courts have considered several comparable cases. In *Robert O. v. Russell K.*, the New York Court of Appeals—that state's highest court—concluded that a biological father could not have a final order of adoption vacated because he did not have a constitutionally protected interest in his child when he failed to develop a relationship with that child, even though he failed to do so only because he was unaware of the child's existence. 604 N.E.2d 99, 103-04 (N.Y. 1992). The court noted, however, that in a prior case it had held that

a father who has promptly taken every available avenue to demonstrate that he is willing and able to enter into the fullest possible relationship with his under-six-month-old child should have an equally fully protected interest in preventing termination of the relationship by strangers, even if he has not as yet actually been able to form that relationship.

*Id.* at 103 (quoting *In re Raquel Marie X.*, 559 N.E.2d 418, 425 (N.Y. 1990)). The New York courts have limited the period in which a biological father

may grasp the opportunity to develop a relationship with his child to the six months prior to the child's placement for adoption, even in cases of newborn adoption. *Id.*

Other courts that have looked at the issue of the biological father's opportunity interest have also decided that it is not a due process violation when that opportunity has been extinguished by the actions of a private party, usually the birth mother. *See, e.g., Petition of Steve B.D.*, 730 P.2d 942, 945-46 (Idaho 1986) (holding that there was no violation of the father's due process rights where the mother, not a state actor, hid the adoption proceedings from the father).

The South Carolina Supreme Court, by contrast, has held that where a biological father has "demonstrated sufficient prompt and good faith efforts to assume parental responsibility" his failure to literally comply with the adoption statutes may be excused. *Doe v. Queen*, 552 S.E.2d 761, 764 (S.C. 2001). In Doe, the biological father, Queen, had been living with the mother when she became pregnant. *Id.* at 762. The mother told Queen that she wanted an abortion and moved out. *Id.* She did not end up terminating the pregnancy and instead carried the child to term. *Id.* During the rest of her pregnancy, Queen had no contact with the mother. *Id.* Indeed, after she signed a warrant for assault, a trial court issued an order forbidding contact. *Id.*

After the child was born, she placed him for adoption. *Id.* Although she did not tell the adoptive parents the father's address, their attorney managed to track him down approximately two months later and asked him to consent to the adoption. *Id.* Queen refused to consent and filed pleadings at a hearing on the adoption eight months after he was informed of the child's birth. *Id.* In the interim, Queen prepared a nursery, opened a savings account in the child's name, and bought medical insurance for the child. *Id.* The trial court determined that the father's consent was required. *Id.* Under those facts, the South Carolina Supreme Court held that Queen had "demonstrated sufficient prompt and good faith efforts to assume parental responsibility" and that therefore his consent was required for the adoption, even though he did not qualify under the statute. *Id.* at 764.

Here, the trial court placed a great deal of responsibility on father to keep close tabs on his child's mother and appellees urge us to do the same. Appellees cite no binding case establishing such a duty.[4]

---

4. This Court has noted that "it is certainly not unreasonable to charge putative fathers with the responsibility to discover the birth of their illegitimate children." *In re Adoption of Clark*, 95 N.C. App. at 9, 381 S.E.2d at 840. Our opinion in *Clark*, however,

**IN RE S.D.W.**

[228 N.C. App. 151 (2013)]

Father cannot be faulted for declining to constantly call and follow his ex-girlfriend or consistently inquire about a potential pregnancy. Indeed, a mother may well consider any such inquiries or observation to constitute harassment or stalking, if she has asked the father to stop communicating with her. He cannot force her to maintain a romantic relationship or even to accept his inquiries. Under appellees' argument, any efforts a father may make to inquire about the mother's pregnancy would be worthless if the mother rebuffs them. She, as much as he, is responsible for having sex outside of marriage and the associated consequences. Were we to hold as appellees urge, a mother could unilaterally terminate a father's rights by lying to him about her pregnancy, lying to the adoption agency about him, and lying to the court about her knowledge of the father with complete impunity. Under our statutes, there would be no remedy for the father and no way for him to assert his rights once the petition is filed, even if the petition is based upon outright fraud by the mother.

The circumstances of this case eliminated father's "inchoate interest" in developing a fully protected relationship with Sean before the petition was filed and cut off that interest immediately, despite the father's prompt actions to try to protect it. Under the plain language of N.C. Gen. Stat. § 48-3-601, once the petition was filed, any opportunity he had to protect his rights was gone solely as a result of the mother's decision not to inform him of her pregnancy and to provide an inaccurate name for the father to the adoption agency.

Our Supreme Court recognized in *Byrd* that giving the biological mother such unilateral power is inconsistent with fundamental fairness:

> We recognize the legislature's apparent desire for fatherhood to be acknowledged definitively regardless of biological link. We also recognize the importance of fixing parental responsibility as early as possible for the benefit of the child. Yet, fundamental fairness dictates that a man should not be held to a standard that produces unreasonable or illogical results. We also believe that the General Assembly did not intend to place the mother in total

---

was reversed by the Supreme Court. *In re Adoption of Clark*, 327 N.C. 61, 393 S.E.2d 791 (1990). This duty has nonetheless been mentioned by this Court in *In re Baby Boy Dixon*, 112 N.C. App. 248, 251, 435 S.E.2d 352, 354 (1993), and in *In re T.L.B.*, 167 N.C. App. at 303, 605 S.E.2d at 252. Neither case, however, reached the constitutional question of whether the imposition of such a duty would be consistent with a biological father's constitutionally protected interest in the opportunity to develop a relationship with his child where the biological father has actually come forward to attempt to establish such a relationship.

**IN RE S.D.W.**

[228 N.C. App. 151 (2013)]

control of the adoption to the exclusion of any inherent
rights of the biological father.

*In re Byrd,* 354 N.C. at 194, 552 S.E.2d at 146.

The adoption statutes as applied here have exactly the effect of
placing "the mother in total control of the adoption to the exclusion
of any inherent right of the" father. *Id.* The State's interest in establishing
a permanent home for the minor child is undoubtedly a valid and impor-
tant one. Yet, the State's interest in permanence is not fully established
in this case where the adoption proceeding is still pending. This case
is not one where the biological father is attempting to assert his rights
after the adoption decree has been issued and a new family created.
Additionally, this is not a case where the biological father seeks only to
block the adoption without asserting his intention and plans to take full
responsibility for the child. Instead, if the facts are as father has alleged
them to be, he has demonstrated an interest and willingness "to shoul-
der the responsibilities that are attendant to rearing a child." *Price,* 346
N.C. at 79, 484 S.E.2d at 534.

We hold that where a biological father, who prior to filing of the
adoption petition was unaware that the mother was pregnant and had
no reason to know of the pregnancy[5], promptly takes steps to assume
parental responsibility upon discovering the existence of the child has
developed a constitutionally protected interest sufficient to require his
consent where the adoption proceeding is still pending. This holding
does not prevent the termination of the parental rights of an unknown
father who has failed to respond to notice of the imminent termination
of his rights. *Cf. In re Baby Boy Dixon,* 112 N.C. App. at 251-52, 435
S.E.2d at 353-54 (holding that due process was not offended by terminat-
ing the parental rights of an unknown father who was given notice, but
failed to respond).

The adoption petition here had been pending for only fourteen
days prior to the filing of a petition to terminate parental rights on 16
November 2010. The adoption proceeding was stayed for the pendency
of the termination proceeding. It was in the middle of that proceed-
ing that Mr. Johns discovered the existence of Sean. Mr. Johns called
Ms. Welker on 25 April 2011 after hearing from an acquaintance that
Ms. Welker might have had a child. She confirmed that she had given

---

5. We do not consider the basic biological fact that any act of sexual intercourse
may result in pregnancy to be the same as "reason to know" that a particular woman may
actually be pregnant. The father need not have actual knowledge, but he must have some
knowledge that would lead a reasonable person to believe that the woman is pregnant.

birth to a child and told him the name of the adoptive parents and the adoption agency.

After Mr. Johns appeared in the termination proceeding and indicated that he would not consent to an adoption, the agency dismissed its termination petition on 2 May 2011. The stay on the adoption proceeding was lifted on 5 May 2011. On 11 May 2011, petitioners served notice on Mr. Johns' brother that the stay had been lifted. On 24 May 2011, Mr. Johns sent a letter to the Clerk of Superior Court and to counsel for the adoption agency stating that "I, Gregory Joseph Johns, am requesting a DNA test to prove that I am the biological father of [Sean]. Once the DNA test proves me to be the father of [Sean], I am requesting that the adoption be terminated and I take [Sean] into custody." On 15 August 2011, Mr. Johns filed a motion to intervene, motion for disclosure of file, motion to dismiss petition for adoption, petition to legitimate child, and motion for child custody. In response, petitioners filed a motion for summary judgment.

The trial court held a hearing concerning the motions to dismiss and for summary judgment. The trial court refused to take live testimony at the hearing on the summary judgment motion, but allowed Mr. Johns to testify in support of his motion to dismiss under N.C. Gen. Stat. § 48-2-102.

At the hearing, Mr. Johns claimed that since learning of his son's existence, he sent the child letters and presents, scheduled an appointment with a pediatrician, and set up a nursery in his home. He also testified that he attempted to contact the adoptive parents and set up a way to visit his son, but that these efforts were rebuffed. Nevertheless, we cannot make findings about the credibility of Mr. Johns' assertions. *See Godfrey v. Zoning Bd. of Adjustment of Union County*, 317 N.C. 51, 63, 344 S.E.2d 272, 279 (1986) ("Fact finding is not a function of our appellate courts."). We must remand this case to the trial court to make appropriate findings of fact and conclusions of law.

Because the trial court only analyzed the facts under the N.C. Gen. Stat. § 48-3-601, which would require father to take some action *before* the adoption petition was filed—in this case a practical impossibility—it concluded that there was no genuine issue of material fact and granted summary judgment. Having held that a biological father is entitled to the opportunity to develop a relationship with his child, we must remand to the trial court for a full hearing concerning the issue of whether Mr. Johns grasped the opportunity to act as a parent when that opportunity appeared. In other words, the trial court should determine what actions

Mr. Johns took after learning of the existence of his son. If the trial court finds that Mr. Johns in fact made reasonable and consistent efforts to "shoulder the responsibilities that are attendant to rearing a child," *Price*, 346 N.C. at 79, 484 S.E.2d at 534, after discovering Sean's existence, considering the fact that father had no legal means to have actual contact with the child due to the adoption petition, then he has developed a constitutionally protected interest and his consent is required for the adoption to be finalized. *See, e.g., In re Adoption of K.A.R.*, 205 N.C. App. 611, 617, 696 S.E.2d 757, 761-62 (2010) ("Here, Alvarez did what the trial court found to be reasonable given his means and financial resources; he obtained items—a baby car seat, a baby crib mattress, and baby clothing—that could be used only for the support of the minor child."), *disc. rev. denied*, ___ N.C. ___, 706 S.E.2d 236 (2011).

## VII. Conclusion

We hold that where a biological father, who prior to the filing of the petition was unaware that the mother was pregnant and had no reason to know, promptly takes steps to assume parental responsibility upon discovering the existence of the child has developed a constitutionally protected interest sufficient to require his consent where the adoption proceeding is still pending. In this case, the trial court did not have the opportunity to develop a complete record and make findings on that issue. Therefore, we must reverse the order granting petitioners' motion for summary judgment and denying father's motion to intervene. We remand for an evidentiary hearing and entry of a revised order.

REVERSED and REMANDED.

Judges HUNTER, Robert C. and ERVIN concur.