IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-126

No. COA21-196

Filed 1 March 2022

Wake County, No. 13 SP 2914

IN THE MATTER OF THE ADOPTION OF: C.H.M., a minor child.

Appeal by respondent from order entered 13 August 2020 by Judge Debra Sasser in Wake County District Court. Cross-appeal by petitioners from order entered 21 July 2020 by Judge Debra Sasser in Wake County District Court. Heard in the Court of Appeals 14 December 2021.

*Manning, Fulton & Skinner, P.A., by Michael S. Harrell, for petitioners-appellees/cross-appellants.*

*Jonathan McGirt for respondent-appellant/cross-appellee.*

TYSON, Judge.

¶ 1    Venson Westgate ("Respondent") appeals the trial court's order denying his motion to dismiss the adoption petition. We affirm. Carolyn and Michael Morris' ("Petitioners") cross-appeal is dismissed as moot.

## I.    Background

¶ 2    The factual background of this case is set forth in three previous appellate opinions: *In re C.H.M.*, 245 N.C. App. 566, 782 S.E.2d 582, 2016 WL 611926 (2016)

(unpublished) (affirming the dismissal of Petitioners' petition for termination of Respondent's parental rights to his minor daughter, C.H.M.); *In re Adoption of C.H.M.*, 248 N.C. App. 179, 189, 788 S.E.2d 594, 600 (2016), (affirming trial court's order concluding Respondent's consent is required to proceed with the adoption of his minor daughter, C.H.M.), *rev'd*, 371 N.C. 22, 23, 812 S.E.2d 804, 806 (2018) ( holding "respondent failed to meet his burden of proving that he provided such support within the relevant statutory period, we conclude that the evidence is legally insufficient to support the trial court's order requiring respondent's consent").

¶ 3     The Supreme Court of North Carolina's 4-3 decision, reversing this Court's unanimous opinion that Respondent had complied with N.C. Gen. Stat. § 48-3-601(2)(b)(4)(II) did not address Respondent's due process arguments.  The Supreme Court remanded the cause to this Court for further remand to the trial court "for proceedings consistent with [the] opinion." *Adoption of C.H.M.*, 371 N.C. at 34, 812 S.E.2d at 812.

¶ 4     The trial court issued its order upon remand on 15 November 2018.  The order states, "[as] a result of the North Carolina Supreme Court's holding that '[R]espondent's evidence was insufficient as a matter of law to support the trial court's conclusion that respondent [had] complied with the statutory support payment requirements' [the court's] finding is no longer supported by the evidence."

¶ 5     The trial court deferred and set for hearing Respondent's motion to intervene,

motions to dismiss the adoption petitions pursuant to N.C. Gen. Stat. § 48-2-604 and asserting federal and state constitutional due process provisions. Prior to this hearing being held, both parties entered notices of appeal.

¶ 6        The parties most recently appeared before this Court in January 2020, wherein this Court issued an order dismissing the parties' interlocutory appeals and directing the cause be remanded to the district court for hearing and resolution of the remaining issues and motions before the court.

¶ 7        Following a hearing on 10 June 2020, the trial court issued its order ("August 2020 Order") on 13 August 2020, denying Respondent's motion in the cause and motion to dismiss the adoption. The trial court concluded Respondent had a limited right to intervene in the action for the court to determine whether N.C. Gen. Stat. § 48 was unconstitutional as applied to him. The trial court found and concluded Respondent "does not qualify for the class of protected fathers whose liberty interests are such that he would enjoy a constitutionally paramount protected interest to C.H.M.'s custody."

¶ 8        The facts underlying Respondent's and Petitioners' dispute over C.H.M. are well-documented and not in dispute. The parties presently have two additional cases pending in Wake County district court involving their eight-year-dispute over C.H.M. The painful saga beginning with the birth mother's dishonesty regarding Respondent's paternity of C.H.M. need not be repeated.

## II. Jurisdiction

¶ 9        "A party to an adoption proceeding may appeal a judgment or order entered by a judge of district court by giving notice of appeal as provided in G.S. 1-279.1." N.C. Gen. Stat. § 48-2-607(b) (2021).  Respondent timely appealed.  He asserts his appeal of right is made pursuant to N.C. Gen. Stat. §§ 1-277(a), 1-278 and 7A-27(b)(3)(a) & (c) (2021).

¶ 10        Petitioners ask this Court to dismiss Respondent's appeal.  Respondent acknowledges his appeal may be interlocutory.  The August 2020 Order transfers jurisdiction of the matter to the Wake County Clerk of Court, Division of Special Proceedings with instructions that the adoption proceeding be resolved in accordance with the mandate of the North Carolina Supreme Court, this Court, and the subsequent orders of the trial court.

¶ 11        Respondent asserts a substantial right will be lost if this appeal is not immediately heard.  He shows, and Petitioners do not dispute, the August 2020 Order resolves all remaining motions and issues.  Our appellate courts have recognized that orders concerning whether a parent's consent to an adoption is required implicate a substantial right and are immediately appealable.  *In re Adoption of Baby Boy*, 233 N.C. App. 493, 498, 757 S.E.2d 343, 346 (2014).

¶ 12        Respondent asserts "[if] the adoption proceeds to a final decree of adoption, any parental rights that [he] may have had would be terminated.  Moreover, the adoption

statute severely limits the avenues for challenging a final decree of adoption through appeal." *In re S.D.W.*, 228 N.C. App. 151, 155, 745 S.E.2d 38, 42 (2013) (citations omitted), *rev'd on other grounds sub nom., In re Adoption of S.D.W.*, 367 N.C. 386, 758 S.E.2d 374 (2014). We agree and address the merits of Respondent's appeal. Petitioners' cross appeal of an unrelated interlocutory order, subsequently stayed by our Supreme Court, is dismissed by separate order.

### III.    Issue

Whether the trial court erred by denying Respondent's motion to dismiss the adoption petition.

### IV.    Analysis

Respondent argues the trial court erred by concluding his conduct excluded him from the constitutionally protected class of fathers, whose liberty interests would be violated if the adoption petition were allowed. We reject Petitioners' arguments that Respondent had not asserted or preserved this argument for appeal. The record and pleadings clearly show: (1) Respondent repeatedly asserted this argument; (2) it was not addressed by our Supreme Court; and, (3) was not ripe for our review upon remand until ruled upon by the trial court upon remand in its August 2020 Order.

Respondent asserts applying Chapter 48 to preclude his consent to the adoption of C.H.M. violates his due process rights. His challenge is an as-applied challenge to N.C. Gen. Stat. § 48-3-601 (2021). An as-applied challenge represents a

party's "protest against how a statute was applied in the particular context in which [the party] acted or proposed to act." *Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.*, 247 N.C. App. 444, 460, 786 S.E.2d 335, 347 (2016) (citation omitted), *aff'd,* 369 N.C. 722, 799 S.E.2d 611 (2017).

## A. Fundamental Parental Rights

¶ 16 The Supreme Court of the United States "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 147 L. Ed. 2d 49, 57 (2000).

> This parental liberty interest is perhaps the oldest of the fundamental liberty interests the United States Supreme Court has recognized. This interest includes the right of parents to establish a home and to direct the upbringing and education of their children. Indeed, the protection of the family unit is guaranteed not only by the Due Process Clause, but also by the Equal Protection Clause of the Fourteenth Amendment and possibly by the Ninth Amendment.

*Owenby v. Young*, 357 N.C. 142, 144–45, 579 S.E.2d 264, 266 (2003) (citations and internal quotation marks omitted).

## B. Trial Court's Findings of Fact

¶ 17 Relevant to Respondent's present appeal, the trial court found:

> 8. Respondent had no ability to visit C.H.M. nor have access to her except at the discretion of the Petitioners and/or Agency.
>
> 9. Respondent made no request to the adoption agency

(Hereinafter the "Agency") or the Petitioners for any additional visits with C.H.M. in 2014 after the March 2014 visit. During this time period he continued to purchase items for the child but did not send those items to the agency or Petitioners for the remainder of that year.

10. Respondent did not request from either the Agency or the Petitioners any information as to C.H.M.s well-being or development for the remainder of 2014.

11. Respondent has never had an email address for the Petitioners. Respondent was first provided the cell phone number for Petitioner [] at or around the time the parties had mediation in October 2016.

12. Petitioners continued to reside for the remainder of 2014 at the address they resided at when the Respondent and his family visited C.H.M. in March, 2014. (The Petitioners still reside at this address.)

13. Respondent continued to save money for C.H.M. in his "lockbox" during the remainder of 2014.

14. There is a dispute in the evidence and evidence proffer before this Court as to whether Respondent through counsel offered the existing funds in his lockbox of over $3260 to Petitioners' counsel at the conclusion of the hearing in April, 2014. The Court does not find this dispute to be material.

15. After the hearing in April 2014 and until January 30, 2015 Respondent paid noting for C.H.M.'s support.

 . . .

23. Respondent after being served with the petition to terminate his parental rights wrote a letter to A Child's Hope dated January 30, 2015. That letter stated Respondent had saved a total of approximately $5,270 for

C.H.M. and enclosed a cashier's check to the agency for $2,635 for C.H.M.'s benefit. Respondent stated he desired to send the remaining funds for C.H.M.'s benefit, and he subsequently did so. That letter requested pictures of C.H.M. and information about her developmental milestones and reiterated that he continued to want custody of C.H.M.

¶ 18    Respondent does not challenge these findings as unsupported by properly admitted evidence. Instead, he contends an unenumerated category of parental rights exists that requires his consent for adoption under N.C. Gen. Stat. § 48-3-601.

## C. *Lehr v. Robertson*

¶ 19    Respondent asserts this category has its roots in the Supreme Court of the United States' opinion in *Lehr v. Robertson*, 463 U.S. 248, 77 L. Ed. 2d 614 (1983).

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. *If he grasps that opportunity* and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. *If he fails to do so*, the Federal Constitution will not automatically compel a state to listen to his opinion of where the child's best interests lie.

*Id*. at 262, 77 L. Ed. 2d at 627 (emphasis supplied).

¶ 20    Respondent asserts his actions fall within an unenumerated category of N.C. Gen. Stat. § 48-3-601. He argues he had seized all opportunities available to him and that he has done all that he could possibly do under the circumstances "to grasp[]

that opportunity" to "develop a relationship with his offspring." *Id.*

In *Lehr*, the putative father "never had any significant custodial, personal, or financial relationship with [his child], and he did not seek to establish a legal tie until after she was two years old." *Id.* The father asserted he was entitled to an additional special notice, because the trial court and the mother knew that he had filed an affiliation action. *Id.* at 265, 77 L. Ed. 2d at 629.

The question before the Supreme Court was whether New York's statutory adoption scheme protected "the unmarried father's interest in assuming a responsible role in the future of his child." *Id.* at 263, 77 L. Ed. 2d at 627. The Court held the father's opportunity to establish a relationship with his child was adequately protected by the adoption statute "that automatically provide[d] notice to seven categories of putative fathers who are likely to have assumed some responsibility for the care of their natural children." *Id.* at 263, 77 L. Ed. 2d at 628.

This Court has previously interpreted *Lehr*. In the case of *In re Adoption of B.J.R.*, 238 N.C. App. 308, 311, 767 S.E.2d 395, 397 (2014), the father "contend[ed] that his substantive due process rights supplied by the Fourteenth Amendment to the United States Constitution and Article I, Section 19 of the North Carolina Constitution were violated by the district court's determination that his consent to adoption was not required[,] and that Chapter 48 [was] therefore unconstitutional as applied to him."

¶ 24    The trial court's findings in B.J.R., showed the father had "made very few efforts *after* the birth of his child to develop a parent-child relationship." *Adoption of B.J.R.*, 238 N.C. App. at 315, 767 S.E.2d at 399. The trial court found that the pre-adoptive parents had provided the father "*the opportunity* to visit the baby, which he took advantage of on only one occasion . . . a few weeks after the birth." *Id.*

¶ 25    The trial court found the father of B.J.R. had made no further attempts to meet with his child or to provide support for her during the next five months. *Id.* The court found the father had purchased diapers, which he never delivered. This Court noted "during the child's first six months of life, besides filing papers with the court, [the father] largely remained 'passive' in developing a relationship with his child." *Id.*

¶ 26    Here, in this "as-applied" challenge, Respondent contends the Petitioners and the private adoption agency violated his constitutional rights in the manner in which Chapter 48 was applied to him. "[O]nly in as-applied challenges are facts surrounding the plaintiff's particular circumstances relevant." *Town of Beech Mountain*, 247 N.C. App. at 460, 786 S.E.2d at 347 (citation omitted).

¶ 27    The relevant conduct to our review is Respondent's conduct towards C.H.M., once he knew she was his child, and any actions the Petitioners or the adoption agency took to prevent him from acting "to develop a relationship with his offspring." *Lehr*, 463 U.S. at 262, 77 L. Ed. 2d at 627.

**D. N.C. Gen. Stat. § 48 - Adoption**

¶ 28    The Supreme Court of the United States has recognized, "[t]wo state interests are at stake in parental rights termination proceedings—a *parens patriae* interest in preserving and promoting the welfare of the child and a fiscal and administrative interest in reducing the cost and burden of such proceedings." *Santosky v. Kramer*, 455 U.S. 745, 766, 71 L. Ed. 2d 599, 615 (1982).

¶ 29    Chapter 48 sets forth our General Assembly's stated purpose:

> (a) . . . it is in the public interest to establish a clear judicial process for adoptions, to promote the integrity and finality of adoptions, to encourage prompt, conclusive disposition of adoption proceedings, and to structure services to adopted children, biological parents, and adoptive parents that will provide for the needs and protect the interests of all parties to an adoption, particularly adopted minors.
>
> (b) With special regard for the adoption of minors, the General Assembly declares as a matter of legislative policy that:
>
>> (1) The primary purpose of this Chapter is to advance the welfare of minors by (i) protecting minors from unnecessary separation from their original parents, (ii) facilitating the adoption of minors in need of adoptive placement by persons who can give them love, care, security, and support, (iii) protecting minors from placement with adoptive parents unfit to have responsibility for their care and rearing, and (iv) assuring the finality of the adoption[.]

N.C. Gen. Stat. § 48-1-100 (2021).

¶ 30    Our Supreme Court stated: "We believe the General Assembly crafted these

subsections of this statute primarily to protect the interests and rights of men who have demonstrated paternal responsibility and to facilitate the adoption process in situations where a putative father for all intents and purposes has walked away from his responsibilities to mother and child, but later wishes to intervene and hold up the adoption process." *In re Adoption of Byrd*, 354 N.C. 188, 194, 552 S.E.2d 142, 146 (2001). The trial court's extensive findings and conclusions set forth herein focus on the initial and immediate responses of respondent and reveal whether Respondent "demonstrated paternal responsibility" or his lack thereof. *Id.*

¶ 31 Here, while being duped and deceived by the child's mother into initially believing the child was not his, once he learned C.H.M. was his child, Respondent remained "passive" in developing a relationship with his child. Respondent testified he did not know how to contact Petitioners. However, he and his parents had visited C.H.M. in Petitioners' home when he was in North Carolina for his deposition in this matter. He acknowledged he had mailed no notes, cards, nor gifts to C.H.M. after his one visit with her in 2014. Respondent purchased a crib, which remained in his home in Illinois, and gifts which he did not send to C.H.M., despite knowing Petitioners' and the agency's addresses. Respondent provided no evidence that Petitioners or the agency thwarted him in contacting them or C.H.M. during this period of time.

¶ 32 Here, the trial court's findings focus on Respondent's "demonstrated parental responsibility" or his lack thereof during the period immediately after Respondent

learned he was the father of C.H.M and was served with notice of the pendency of the adoption petition in November 2013. *Id.* Respondent father timely filed his objection to the North Carolina adoption petition in December 2013. Respondent made one visit with C.H.M. in March 2014 while it coincided with a court appearance. Other than his savings in the lockbox and purchase of a crib and some items in Illinois, Respondent did not begin any support payments, make or maintain contacts, or make any other attempts to parent C.H.M. until 30 January 2015 and after Petitioners had filed their Termination of Parental Rights action in November 2014.

¶ 33 The trial court's supported and unchallenged findings and conclusions reveal a father who did not "grasp[] that opportunity and accept[] some measure of responsibility for the child's future." *Lehr*, 463 U.S. at 262, 77 L. Ed. 2d at 627.

¶ 34 As the trial court found, Respondent's later conduct, while laudable, does not remove or excuse his non-actions for nine months in 2014, where "for all intents and purposes [he]. . . walked away from his responsibilities," after visiting his child in Petitioners' home. *In re Byrd*, 354 N.C. at 194, 552 S.E.2d at 146. Respondent's conduct after the 2014 visit failed to preserve his entitlement to the constitutional "protection of the family unit" guaranteed by the Due Process Clause" *Owenby,* 357 N.C. at 144-45, 579 S.E.2d at 266.

## V. Conclusion

¶ 35 The trial court properly found and concluded Respondent has no statutory or

Due Process rights to provide or withhold consent to Petitioners' adoption of C.H.M. Further issues involving these parties are not before us and our opinion remands this matter to the district court and to the clerk of superior court per the trial court's order for further proceedings consistent with North Carolina's adoption laws, N.C. Gen. Stat. § 48-1-100 *et seq.* *It is so ordered.*

AFFIRMED.

Judge CARPENTER concurs.

Judge GORE concurs in part and dissents in part with separate opinion.

GORE, Judge, concurring in part and dissenting in part.

I join the majority opinion, except for the portion holding that Respondent's has no due process right to withhold consent to the adoption. There is an old adage of measuring ten times and cutting once. The majority in this opinion was handcuffed from ever being able to take a proper measurement of the totality of the facts of the case because of the unfathomable deceit and fraud perpetrated by the biological mother. The conduct by the birth mother led to a slippery slope of premature cutting of Respondent's parental rights, by previous rulings and discretionary reviews, prior to the case being heard on its merits and a proper review of the denial of Respondent's due process rights by the trial court.

The core foundation of a parent's rights were expressed when the Supreme Court of the United States "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 66, 147 L. Ed. 2d 49, 57 (2000) (citations omitted).

> This parental liberty interest is perhaps the oldest of the fundamental liberty interests the United States Supreme Court has recognized. This interest includes the right of parents to establish a home and to direct the upbringing and education of their children. Indeed, the protection of the family unit is guaranteed not only by the Due Process Clause, but also by the Equal Protection Clause of the Fourteenth Amendment and possibly by the Ninth Amendment.

*Owenby v. Young*, 357 N.C. 142, 144–45, 579 S.E.2d 264, 266 (2003) (citing *Troxel,* 530 U.S. at 65, 147 L. Ed. 2d at 56; *Meyer v. Nebraska,* 262 U.S. 390, 399-400, 67 L.

Ed. 1042, 1045-46 (1923); *Stanley v. Illinois*, 405 U.S. 645, 661, 31 L. Ed. 2d 551, 559 (1972)).

¶ 38        The Respondent made efforts prior to the child being born to establish his role as a biological parent. Prior to the birth of the child, he attended a doctor's appointment with the biological mother. After the birth of the child, Respondent repeatedly requested the biological mother agree to DNA testing to establish his paternity, which she found excuses to not do. The biological mother also refused offers by Respondent to provide financial support towards prenatal medical bills and any support after the child was born. The record is full of efforts and attempts Respondent made to show he wanted to exercise his right "to establish a home and to direct the upbringing . . ." of a child that could be his own. *Id*. at 144, 579 S.E.2d at 266 (citation omitted).

¶ 39        The record also establishes that the Petitioners in this case at some point actively prevented Respondent from interacting with C.H.M. after initially allowing contact. The Petitioners would not let Respondent refer to himself as "daddy" during the visit he did have, eventually blocked Respondent's calls, and stopped responding to requests for or allow any visitation. There was a period from March of 2014 until January 2015 that Respondent did not contact Petitioners. However, during this time Respondent took actions to prepare himself to parent C.H.M. and to show that he wanted to "grasp[] that opportunity [to parent] and accept[] some measure of

responsibility for the child's future . . . ." *Lehr v. Robertson*, 463 U.S. 248, 262, 77 L. Ed. 2d 614, 627 (1983). In my view the majority's review of Respondent's conduct after he knew C.H.M. was his biological child does not go far enough. It does not scrutinize the trial court's order to establish that Petitioners were not culpable for conduct that impeded Respondent from contacting C.H.M. from March of 2014 until January 2015. The trial court's order establishes in its findings of fact:

> 7. Respondent had no ability to visit C.H.M. nor have access to her except at the discretion of the Petitioners and/or Agency.
>
> …
>
> 11. Respondent has never had an email address for the Petitioners. Respondent was first provided the cell phone number for Petitioner [] at or around the time parties had mediation in October 2016.
>
> …
>
> 17. Petitioner [] testified the Petitioners did not want support for C.H.M. from Respondent.

These findings along with the uncontroverted findings that Petitioners purposefully withheld or blocked Respondent from contact require the trial court to inquire into potential due process violations, and it failed to do so.

¶ 40     My last disagreement with the majority's opinion about the denial of Respondent's due process rights stems from the conduct of the biological mother from the time C.H.M. was born until she was placed for adoption. It appears from the

record that C.H.M. was eleven-days old when placed for adoption on or about 9 July 2013. There is an argument that the biological mother's purposeful denial and refusal to allow Respondent DNA testing hindered his due process rights to a degree that it mandates his right to object or withhold his consent to adopt. The facts viewed in the light most favorable to Respondent, show that if he was on notice that C.H.M. was his child or allowed to have DNA testing done there was an eleven-day window between birth and adoption that he could have filed a custody action to preserve his parental rights. However, Respondent was deliberately denied this opportunity because of the blatant fraud perpetrated by the biological mother. The question we must address is how long is too long for a parent to be deprived their parental due process rights and for a child to be deprived of the opportunity of the love and affection from said parent.

¶ 41 A biological parent must be afforded an opportunity to assert their constitutional rights. Here, Respondent attempted to assert his constitutionally protected rights but was hindered along the way by the fraudulent actions of the child's biological mother. Depriving Respondent of his right to raise his biological child without proper review, especially considering the fact he attempted to assert his rights and duties as a parent before and immediately after the child was born and before he knew with any degree of certainty that C.H.M. was his biological child, is not in line with the paramount rights and protections afforded to biological parents

by the United States Constitution. *See Meyer*, 262 U.S. at 399, 67 L. Ed. at 1045 (finding the rights to conceive and raise one's children have been deemed "essential"); *Skinner v. Oklahoma*, 316 U.S. 528, 541, 97 L. Ed. 1655, 1660 (1942) (finding the right to raise one's child is a "basic civil right[] of man"); *Lehr*, 463 U.S. at 262, 77 L. Ed. 2d at 627 ("The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring.").

¶ 42        While reviewing the totality of the facts of this case the majority is absolutely right that: "[t]he painful saga beginning with the birth mother's dishonesty regarding the Respondent's paternity of C.H.M. need not be repeated." For that very reason I bring out these issues of disagreement with the majority and respectfully concur in part and dissent in part.