IN THE SUPREME COURT OF NORTH CAROLINA

No. 348PA13

FILED 12 JUNE 2014

IN RE ADOPTION OF S.D.W.

On discretionary review pursuant to N.C.G.S. § 7A-31 of a unanimous decision of the Court of Appeals, ___ N.C. App. ___, 745 S.E.2d 38 (2013), reversing orders entered on 10 November 2011 and 17 February 2012 by Judge Elizabeth T. Trosch in District Court, Mecklenburg County, and remanding for an evidentiary hearing and entry of a revised order. Heard in the Supreme Court on 18 February 2014.

*Thurman, Wilson, Boutwell & Galvin, P.A., by W. David Thurman, John D. Boutwell, and Alexander W. Warner, for petitioner-appellants adoptive parents and appellant Christian Adoption Services, Inc.*

*Jonathan McGirt for respondent-appellee father Gregory Johns.*

*Claiborne & Fox, PLLC, by Amy Wallas Fox; and Herring & Mills, PLLC, by Bobby Mills, for American Academy of Adoption Attorneys, amicus curiae.*

EDMUNDS, Justice.

The issue presented in this case concerns the legal ability of a biological father who is unaware that he has fathered a child to object to the mother's decision to place the child for adoption. Appellee Gregory Johns ("Johns") contends that his state and federal due process rights were violated because the adoption deprived him of his rights as a father. We conclude that obtaining notice of the pregnancy

and birth was not beyond Johns's control and that he had sufficient opportunity to acknowledge paternity and establish himself as a responsible parent within the time set by statute. Because he failed to do so, he falls outside the class of responsible biological fathers who enjoy a constitutionally protected relationship with their natural children. As a result, Johns's due process claim fails. We reverse the decision of the Court of Appeals remanding the matter for additional evidence.

Laura Marshburn Welker ("Welker") and Johns acknowledge that they are the biological parents of the minor child "S.D.W." Although they neither married nor cohabited, Johns and Welker were involved in an intimate relationship from approximately May 2009 to February or March 2010. Johns described their involvement as "mostly physical," adding that the couple "had sex[ ] 10 to 20 times a week."

During this time, Johns was aware that Welker had given birth about three years previously to a son who was then living with Welker's mother. Understanding that Welker used a form of birth control that he characterized as an "IUD band," Johns did not wear condoms during intercourse with Welker. In the summer of 2009, Welker became pregnant and she and Johns decided that she would have an abortion. After that pregnancy was terminated, Welker told Johns that she was using another form of birth control. According to Johns: "It's either a shot or a patch. I know she wasn't taking pills every day, that I do know. I don't remember seeing a patch, but I remember we were talking about it, but I'm - - I

would say it was a shot, a birth control shot." Johns continued his practice of not wearing a condom.

At some time around the end of January 2010, Johns broke up with Welker. Even so, until early March 2010, they engaged in additional acts of sexual intercourse during three to five visits Welker made to Johns's home. Thereafter, Welker cut off all contact with Johns, and except for Johns's birthday on 26 November 2010 when Welker stopped by his home to mark the occasion with another act of sexual intercourse, there was no further communication between them until late April 2011.

In the interim, Welker gave birth to S.D.W. on 10 October 2010. The next day, 11 October, she executed an "Affidavit of Parentage" incorrectly naming "Gregory Thomas James" as the father and leaving blank the line for the father's last known address. At the same time, she executed a Department of Social Services form relinquishing custody of S.D.W. to adoption agency Christian Adoption Services, Inc. ("the agency") through its director, James M. Woodward. The agency identified Benjamin Allen Jones and Heather Pitts Jones ("the Joneses" or "petitioners") as prospective adoptive parents for S.D.W., and on 12 October, the infant was placed in their custody, where he has remained. On 27 October, Welker signed a form provided by the agency titled "Birth Father Information," in which she again misidentified the father as "Gregory Thomas James."

The Joneses filed a petition to adopt S.D.W. on 2 November 2010. The agency, relying on the false name provided by Welker, attempted to locate the biological father. On 16 November 2010, after failing to find "Gregory Thomas James," the agency filed a petition to terminate the parental rights of the absent father, an action that resulted in a stay in the adoption proceedings. N.C.G.S. § 48-2-402 (2013).

In late April 2011, Johns first heard that Welker had given birth. After calling Welker on 25 April 2011 and confirming with her both that the child was his and that she had placed the child for adoption, Johns took steps to assert his intention to obtain custodial rights of S.D.W. and to prevent the adoption from proceeding. Welker also contacted the agency in late April to disclose Johns's correct identity, leading counsel for the agency on 2 May 2011 to voluntarily dismiss without prejudice the action to terminate parental rights.

As a result of the dismissal, the temporary stay was removed on 5 May 2011 and petitioners gave notice of their intention to proceed with the adoption. On 17 May 2011, a Notice of Pendency of Adoption Proceedings was served on Johns's brother. On 24 May 2011, acting *pro se*, Johns sent letters to the Clerk of Court of Mecklenburg County and to counsel for the agency, introducing himself, requesting DNA testing, asking that the adoption be terminated, and advising that he would not surrender his parental rights over S.D.W. On 15 August 2011, Johns, now represented by counsel, filed verified motions in the District Court, Mecklenburg

County, seeking to intervene in the adoption proceeding, to dismiss the adoption petition, to secure child custody, and to obtain related relief.

On 19 September 2011, petitioners filed their Response to Respondent's Motions and Motion for Summary Judgment. In this response, petitioners acknowledged that "[a]n issue of fact and law exists as to whether [Johns's] [c]onsent is required" but opposed Johns's Motion to Intervene, arguing that Johns was not a party and that he lacked standing because "he has not seen the minor child nor has he acted in a way that is consistent with the interests, rights, and duties of a parent." Petitioners moved for summary judgment, contending that Johns had failed to carry his burden of showing his consent was required under N.C.G.S. §§ 48-3-601 and 48-3-603. The former statute provides, in pertinent part regarding an agency placement:

> Unless consent is not required under G.S. 48-3-603, a petition to adopt a minor may be granted only if consent to the adoption has been executed by . . . [a]ny man who may or may not be the biological father of the minor but who . . . [b]efore the earlier of the filing of the petition or the date of a hearing under G.S. 48-2-206, has acknowledged his paternity of the minor and . . . [h]as provided, in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor, or both, which may include the payment of medical expenses, living expenses, or other tangible means of support, and has regularly visited or communicated, or attempted to visit or communicate with the biological mother during or after the term of pregnancy, or with the minor, or with both.

N.C.G.S. § 48-3-601 (2013). The latter statute lists persons whose consent is not required. *Id.* § 48-3-603 (2013). The case was transferred from the Assistant Clerk of Court to the district court because of the existence of an issue of fact regarding Johns's consent.

On 19 October 2011, Johns filed his reply to petitioners' response to his motion to intervene and motion to dismiss petitioners' motion for summary judgment. Johns's filing highlighted petitioners' admission that "[a]n issue of fact and law exists as to whether [Johns's] [c]onsent is required" and argued that summary judgment here "is premature and would severely prejudice [his] Constitutionally protected status as the biological parent of the minor child."

On 10 November 2011, Judge Elizabeth T. Trosch entered an order in the District Court, Mecklenburg County, denying Johns's motion to intervene and setting for hearing the Joneses' motion for summary judgment. Johns filed a motion for relief on 21 November 2011, citing North Carolina Rules of Civil Procedure 52, 59, and 60. In this motion, Johns asserted that the trial court should reopen the matter because the court's findings were insufficient and inadequate, and that the court also should set aside its 10 November 2011 order and relieve him of its directives because he had "obtained newly discovered evidence" proving that the agency and Welker knew his true identity before both the action to terminate his parental rights and the adoption petition were filed. Johns asked the court to

set a new trial to determine the merits of his motion to intervene. Later, on 21 December 2011, Johns filed a Motion to Dismiss Petition for Adoption.

A hearing was held on 6 January 2012, at which Judge Trosch heard the Joneses' motion for summary judgment, as well as Johns's motion pursuant to Rules 52, 59, and 60 and his motion to dismiss the petition for adoption. At the conclusion of the hearing, Judge Trosch in open court entered an order allowing the adoption to proceed without Johns's consent and denying all motions made by him. The order was reduced to writing and filed on 17 February 2012.

In its written order, the trial court made numerous findings of fact summarizing the events stated above. It also found that "[t]he Agency made a due and diligent search for 'Gregory Thomas James' after October 11, 2010, but the search was unsuccessful," and that Johns's motion pursuant to Rules 52, 59, and 60 was not verified and was unsupported by any showing of newly discovered evidence. The court determined that "Johns did not rely upon any misrepresentation made by any party . . . . [He] simply did not inquire regarding the existence or identity of the Minor Child." Therefore, the trial court found Johns failed to comply with any provision of "N.C.G.S. [§] 48-3-601 to make his consent necessary in this adoption, nor does any genuine issue of material fact exist with regard to that fact."

In its conclusions of law, the trial court stated that:

> A putative Father who engages in a sexual relationship with a woman multiple times without benefit of contraception is on notice that a child may result from the

> sexual relationship and must make diligent inquiry to discover the existence of his child in order to establish a Constitutional Parental Right regarding that Minor Child.

The trial court determined that no genuine issue of material fact existed regarding Johns's failure to meet the relevant criteria listed in section 48-3-601 and that, as a result, his consent "is not necessary for this adoption to proceed pursuant to N.C.G.S. [§§] 48-3-601 and 48-3-603, and Summary Judgment on this issue on behalf of Petitioners should be granted as a matter of law."

Johns appealed to the Court of Appeals, which reversed the trial court's orders granting petitioners' motion for summary judgment and denying Johns's motion to intervene. *In re S.D.W.*, ___ N.C. App. ___, ___, ___, 745 S.E.2d 38, 40, 51 (2013). The Court of Appeals noted that the appeal is interlocutory but concluded that the trial court's order affects a substantial right and that deprivation of this right could cause Johns irreparable damage. *Id.* at ___, 745 S.E.2d at 41-42. The Court of Appeals determined that the issues on appeal boiled down to "whether the trial court properly concluded that [Johns's] consent was not required under the adoption statutes and under the state or federal constitutions and whether the trial court properly interpreted the statutes at issue." *Id.* at ___, 745 S.E.2d at 42. Although the Court of Appeals found that "the trial court correctly concluded that [Johns's] consent is not required" under N.C.G.S. § 48-3-601, *id.* at ___, 745 S.E.2d

at 44, the Court of Appeals went on to consider the constitutional implications of

Johns's claim, holding that when

> a biological father, who prior to the filing of the petition
> was unaware that the mother was pregnant and had no
> reason to know [of the pregnancy], promptly takes steps
> to assume parental responsibility upon discovering the
> existence of the child has developed a constitutionally
> protected interest sufficient to require his consent where
> the adoption proceeding is still pending.

*Id.* at ___, 745 S.E.2d at 51. Concluding that insufficient facts existed in the record

to determine whether applying N.C.G.S. § 48-3-601 to Johns would violate his due

process rights, *id.* at ___, 745 S.E.2d at 44, the Court of Appeals reversed the trial

court's orders on the motions and remanded the case with instructions to the trial

court to conduct an evidentiary hearing and enter revised findings of fact and

conclusions of law, *id.* at ___, 745 S.E.2d at 50-51. This Court allowed discretionary

review.

When constitutional rights are implicated, the appropriate standard of

review is de novo. *Libertarian Party of N.C. v. State*, 365 N.C. 41, 46, 707 S.E.2d

199, 202-03 (2011) (citing *Piedmont Triad Reg'l Water Auth. v. Sumner Hills, Inc.*,

353 N.C. 343, 348, 543 S.E.2d 844, 848 (2001)). The initial question we must

consider is "the extent to which a natural father's biological relationship with his

child receives protection under the Due Process Clause." *Lehr v. Robertson*, 463

U.S. 248, 258, 103 S. Ct. 2985, 2992, 77 L. Ed. 2d 614, 624 (1983). Because Johns

has not argued that the Law of the Land Clause of the Constitution of North

Carolina and the Due Process Clause of the Constitution of the United States are to be interpreted differently here, we will not distinguish between them in our analysis.

While the facts and applicable statutes in *Lehr*, cited above, are not identical to those at bar, the Supreme Court's analysis in that case provides useful guidance. Lehr had lived with the mother of the child in question, though they never married. *Id.* at 251-52, 103 S. Ct. at 2988, 77 L. Ed. 2d at 620-21. Apparently Lehr knew the child was his, for he visited the mother in the hospital when the baby was born. *Id.* at 252, 103 S. Ct. at 2988, 77 L. Ed. 2d at 620. After the birth, Lehr did not live with the mother, provide financial support, enter his name in New York's putative father registry, or offer to marry the mother, who married another man about eight months after the birth. *Id.* at 250-52, 103 S. Ct. at 2987-88, 77 L. Ed. 2d at 619-21. Approximately two years after the child was born, the mother and her husband filed an adoption petition in New York. *Id.* at 250, 103 S. Ct. at 2987, 77 L. Ed. 2d at 619. One month later, Lehr, who was unaware that an adoption proceeding had been filed and was still pending, filed a "visitation and paternity petition" in which he sought a determination of paternity, an order of support, and reasonable visitation privileges with the child. *Id.* at 252, 103 S. Ct. at 2988-89, 77 L. Ed. 2d at 621. After making his filing, Lehr first learned on 3 March 1979 of the pending adoption proceeding. *Id.* at 253, 103 S. Ct. at 2989, 77 L. Ed. 2d at 621.

The trial court conducted a hearing and, after receiving a favorable report from the county Department of Social Services, entered an order of adoption on 7 March 1979. *Id.* at 250, 103 S. Ct. at 2987, 77 L. Ed. 2d at 619. Later that same day, the trial judge advised Lehr's counsel that, while he was aware of Lehr's pending paternity petition, he had already signed the adoption order and did not believe he was required to give notice to Lehr before entering the order. *Id.* at 253, 103 S. Ct. at 2989, 77 L. Ed. 2d at 621. The trial judge denied Lehr's motion to vacate the order of adoption, and the New York Court of Appeals affirmed. *Id.*

The Supreme Court of the United States also affirmed. 463 U.S. at 268, 103 S. Ct. at 2997, 77 L. Ed. 2d at 631. The Court observed that Lehr was subject to New York's adoption scheme, under which several classes of putative fathers are entitled to be given notice of any adoption proceedings. *Id.* at 250-51, 103 S. Ct. at 2985, 2988, 77 L. Ed. 2d at 619-20. Lehr, like Johns, admitted he was not a member of any of the classes defined by his state's statute but contended that nevertheless, he had a right to notice and a hearing under the Constitution of the United States. *Id.* at 251-52, 103 S. Ct. at 2988, 77 L. Ed. 2d at 620-21. Lehr argued that "a putative father's actual or potential relationship with a child born out of wedlock is an interest in liberty which may not be destroyed without due process of law; . . . therefore . . . he had a constitutional right to prior notice and an opportunity to be heard before he was deprived of that interest." *Id.* at 255, 103 S. Ct. at 2990, 77 L. Ed. 2d at 622.

The Supreme Court began its analysis by observing that:

> The Fourteenth Amendment provides that no State shall deprive any person of life, liberty, or property without due process of law. When that Clause is invoked in a novel context, it is our practice to begin the inquiry with a determination of the precise nature of the private interest that is threatened by the State. Only after that interest has been identified, can we properly evaluate the adequacy of the State's process.

*Id.* at 256, 103 S. Ct. at 2990, 77 L. Ed. 2d at 623 (citations omitted). Accordingly, the Court considered the nature of a biological father's liberty interest in developing a relationship with his illegitimate child. *See id.* After acknowledging that "[t]he intangible fibers that connect parent and child . . . . are sufficiently vital to merit constitutional protection in appropriate cases," *id.*, the Court limited the reach of such protection because " 'it by no means follows that each unwed parent has any such right. *Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring,*' " 463 U.S. at 260, 103 S. Ct. at 2992, 77 L. Ed. 2d at 626 (quoting *Caban v. Mohammed,* 441 U.S. 380, 397, 99 S. Ct. 1760, 1770, 60 L. Ed. 2d 297, 310 (1979) (Stewart, J., dissenting) (emphasis added)). The Court then considered how a biological father could nurture a relationship meriting constitutional protection:

> The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and

make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Id.* at 262, 103 S. Ct. at 2993-94, 77 L. Ed. 2d at 627 (footnote omitted).

The Supreme Court then went on to consider whether New York's statute adequately protected Lehr's opportunity to form a relationship with his child. *Id.* at 263-65, 103 S. Ct. at 2994-95, 77 L. Ed. 2d at 627-29. The Court concluded that the statute provides adequate protections, *id.* at 265, 103 S. Ct. at 2995, 77 L. Ed. 2d at 629, and that, because he never formed a "substantial" relationship with his child, the statute did not deny Lehr equal protection, *id.* at 267, 103 S. Ct. at 2996, 77 L. Ed. 2d at 630.

Against this backdrop, we now turn to Johns's case. Recognizing the concern for a biological father's interest identified in *Lehr*, which exists only in those men who have "grasp[ed] that opportunity [to develop a relationship with their offspring] and accept[ed] some measure of responsibility for the child's future," *id.* at 262, 103 S. Ct. at 2993, 77 L. Ed. 2d at 627, North Carolina has adopted a statutory framework designed to protect "both the interests of biological fathers in their children and the children's interest in prompt and certain adoption procedures," *id.* at 263, 103 S. Ct. at 2994, 77 L. Ed. 2d at 628. Like the New York statute, the North Carolina statute designates classes of biological fathers entitled to notice. N.C.G.S. § 48-2-401 (2013); *see also id.* § 48-3-601 (2013).

However, as the Supreme Court noted in *Lehr*, statutes that establish classes of biological fathers entitled to notice nevertheless may fail constitutional scrutiny (1) if they omit too many responsible fathers, or (2) if the qualifications for notice are beyond the control of an interested putative father. *Lehr*, 463 U.S. at 263-64, 103 S. Ct. at 2994, 77 L. Ed. 2d at 628. Even though the question of Johns's rights as a biological father are raised in the context of consent under N.C.G.S. § 48-3-601, while Lehr's rights were considered under a New York statute dealing with notice, that difference is insignificant because notice and consent are intertwined. A father who has not received notice cannot give or withhold consent. As to the first question, whether the statute is "likely to omit many responsible fathers," *id.* at 264, 103 S. Ct. at 2994, 77 L. Ed. 2d at 628, Johns does not challenge the statute's definitions of those responsible men whose consent to an adoption is necessary. Nor does he claim that he falls into any statutorily defined category by virtue of an acknowledgement of paternity before the 2 November 2010 filing of the petition for adoption. Accordingly, he is not asserting that the categories set out in the statute omit too many responsible fathers, *id.*, and we will assume for the purposes of this case that the categories of fathers statutorily entitled to notice are adequate.

Instead, Johns's challenge arises under the second *Lehr* inquiry, whether the qualification for notice was beyond his control. *Id.* Specifically, he argues that he was deprived of knowledge of S.D.W.'s birth and denied the opportunity to demonstrate his commitment as a parent within the time provided by the statute.

As we consider this contention, we observe that Johns's case can be distinguished from *Lehr* on the grounds that Welker took steps to disguise Johns's identity and failed to advise Johns of the child's birth when given the opportunity. In contrast, the Supreme Court's recitation of the facts in *Lehr* noted that "[t]here is no suggestion in the record that [the mother] engaged in fraudulent practices that led [Lehr] not to protect his rights." 463 U.S. at 265 n.23, 103 S. Ct. at 2995 n.23, 77 L. Ed. 2d at 629 n.23. Accordingly, we must consider whether, under the facts presented here, obtaining notice of S.D.W.'s birth was beyond Johns's control.

Johns contends that petitioners urge us to adopt a rule that an act of sex is by itself notice of a possible resulting pregnancy. We instead decide this case on the basis of the facts as applied to the statutes. Both parents demonstrated troubling behavior. Welker provided a false name for the father, both when S.D.W. was born and again later when she signed the adoption service's "Birth Father Information" form, obstructing official efforts to locate the father. When she visited Johns to celebrate his birthday less than two months after S.D.W. was born, she kept the news of the birth to herself.

Johns, on the other hand, demonstrated only incuriosity and disinterest. He knew that Welker was fertile because she already had a child when they met. He knew that, despite Welker's purported use of birth control, he had impregnated her once, leading to an abortion. He assumed that her subsequent birth control methods would be effective without making detailed inquiry. He and Welker

continued an active sex life, even after they broke up. From Johns's perspective, the sex was unprotected and contraception was wholly Welker's responsibility. The burden on him to find out whether he had sired a child was minimal, for he knew how to contact Welker. All he had to do was ask, for when he finally did call her, she told him. All the while, S.D.W. continued to live and bond with his adoptive parents.

From this dreary record we conclude that, despite our concern over Welker's behavior, nothing she did or failed to do placed Johns in a position in which "qualification for notice" of the existence of S.D.W. was "beyond [his] control" during the relevant statutory time frame. *See Lehr*, 463 U.S. at 264, 103 S. Ct. at 2994, 77 L. Ed. 2d at 628. Accordingly, we conclude both that Johns had the opportunity to be on notice of the pregnancy and that he failed to grasp that opportunity by taking any of the steps that would establish him as a responsible father. Because of his passivity in the face of ample evidence that Welker may have become pregnant with his child and given birth, Johns does not fall into the class of protected fathers who may claim a liberty interest in developing a relationship with a child, and thus he was not deprived of due process. We reverse the decision of the Court of Appeals.

REVERSED.

Justice JACKSON dissenting.

In the instant case, this Court is asked to determine "the legal ability of a biological father who is unaware that he has fathered a child to object to the mother's decision to place the child for adoption." *In re S.D.W.*, ___ N.C. ___, ___, ___ S.E.2d ___, ___ (June 12, 2014) (348PA13). Because I believe that the trial court's findings are insufficient to support the majority's determination "that obtaining notice of the pregnancy and birth was not beyond Johns's control and that he had sufficient opportunity to acknowledge paternity and establish himself as a responsible parent within the time set by statute,"[1] *id.* at ___, ___ S.E.2d at ___, I respectfully dissent. *See Lehr v. Robertson*, 463 U.S. 248, 262, 103 S.Ct. 2985, 2993, 77 L.Ed.2d 614, 627 (1983).

Central to the majority's analysis is the conclusion that Johns does not have a claim based upon federal or state substantive due process because, "under the facts presented here, obtaining notice of S.D.W.'s birth was [not] beyond Johns's control." *In re S.D.W.*, ___ N.C. at ___, ___ S.E.2d at ___. As the majority notes, the key precedent in this case is the United States Supreme Court's opinion in *Lehr v. Robertson*. The majority has correctly recounted the facts and procedural history in that case, with one significant exception. As described in the majority opinion, the

---

[1] I note, as did the Court of Appeals, that Johns sought to establish a relationship with his biological child after the adoption petition had been filed, but before completion of the adoption. *See In re S.D.W.*, ___ N.C. App. ___, ___, 745 S.E.2d 38, 49-50 (2013). I express no opinion about whether, had the adoption been finalized, the interests of the State, S.D.W., and the adoptive parents in finality would outweigh Johns's interests as a biological parent.

key holding in that case was that a mere biological connection is insufficient to create a full-fledged constitutional right, based upon substantive due process, to the care and custody of one's biological children. *See Lehr*, 463 U.S. at 260, 103 S. Ct. at 2992, 77 L. Ed. 2d at 626 ("Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." (citation, emphasis, and quotation marks omitted)). What the majority discounts from its analysis, however, is that *Lehr* established that biological fathers possess at least an "inchoate" interest in their offspring, which is constitutionally entitled to at least some measure of protection. *See id.* at 249-50, 103 S. Ct. at 2987, 77 L. Ed. 2d at 619 ("The question presented is whether New York has sufficiently protected an unmarried father's inchoate relationship with a child whom he has never supported and rarely seen in the two years since her birth."). The Supreme Court noted that the issue in *Lehr* was "not . . . the constitutional adequacy of New York's procedures for terminating a *developed* relationship." *Id.* at 262, 103 S. Ct. at 2994, 77 L. Ed. 2d at 627 (emphasis added). Such a "developed parent-child relationship" merits "substantial protection under the Due Process Clause." *Id.* at 261, 103 S. Ct. at 2993, 77 L. Ed. 2d at 626. The biological father in *Lehr*, however, did not have a "developed" relationship with his child because he "never had any significant custodial, personal, or financial relationship with [the child], and he did not seek to establish a legal tie until after [the child] was two years old." *Id.* at 262, 103 S. Ct. at 2994, 77 L. Ed. 2d at 627. Nevertheless, the Supreme Court noted that

a biological connection "offers the natural father an *opportunity* that no other male possesses *to develop a relationship* with his offspring." *Id.* at 262, 103 S. Ct. at 2993, 77 L. Ed. 2d at 627 (emphases added). Accordingly, the Supreme Court examined "whether New York has adequately protected [a putative father's] *opportunity to form* such a relationship."[2] *Id.* at 262-63, 103 S. Ct. at 2994, 77 L. Ed. 2d at 627 (emphasis added). Therefore, pursuant to *Lehr*, any statutory framework, on its face and as applied, must respect that inchoate interest by allowing biological fathers to "grasp[ ] th[e] opportunity" to develop that interest into a relationship more substantial and more enduring. *Id.* at 262, 103 S. Ct. at 2993, 77 L. Ed. 2d at 627. The issue here, then, is whether the opportunities afforded to Johns in this case were adequate to protect that interest.

I conclude that they were not. While the majority also has accurately recounted the facts and circumstances that preceded S.D.W.'s birth and the filing of the petition for adoption, I think several of these facts do not support the majority's conclusion, and some likely undermine it. First, the majority notes that Welker told

---

[2] The Supreme Court then determined in *Lehr* that the father's "right to receive notice was completely within [his] control." 463 U.S. at 264, 103 S. Ct. at 2995, 77 L. Ed. 2d at 628. Specifically, he "could have guaranteed that he would receive notice of any proceedings to adopt [the child]" by "mailing a postcard to the putative father registry." *Id.* The Court stated that if New York's statutory adoption scheme "were likely to omit many responsible fathers, and if qualification for notice were beyond the control of an interested putative father, it might be thought procedurally inadequate." 463 U.S. at 264, 103 S. Ct. at 2994, 77 L. Ed. 2d at 628. I note that our Legislature has not enacted a statutory adoption scheme that provides for a putative father registry. *See* N.C.G.S. §§ 48-1-100 to -10-105 (2013).

defendant that she was using birth control, specifically an intrauterine device, a hormonal patch, or a hormonal shot. *See In re S.D.W.*, ___ N.C. at ___, ___ S.E.2d at ___. However, despite this, the majority concludes that Johns should have been on notice, in part because he did not use condoms *in addition to* one of these other methods of birth control. *Id.* at ___, ___ S.E.2d at ___. In my view, it is unrealistic to require potential biological fathers to use multiple, redundant forms of contraception or risk losing any rights they might have to raise and care for any children that result from this (protected) sexual activity.

Second, the majority opines that defendant should have been aware of Welker's continued fertility because he previously had impregnated her, and they had decided together that she would get an abortion. *Id.* at ___, ___ S.E.2d at ___. My reading of the majority opinion suggests that this history should have urged Johns to remain in contact with Welker and affirmatively inquire whether she was pregnant with his child, even after their romantic relationship ended; however, in my view, this prior incident argues to the contrary. Because Welker previously informed Johns when she became pregnant, it was reasonable for him to believe that she would tell him if she became pregnant again.[3]

Third, Welker declined to tell Johns about her pregnancy or the birth of S.D.W., despite having every opportunity to do so. Welker knew during the entire

---

[3] It is worth noting that Welker visited Johns on 26 November 2010 to celebrate his birthday. This was over one month after S.D.W. was born on 10 October 2010.

duration of the pregnancy that Johns was the biological father. She knew his address: Johns lived at the same apartment for several years, including at the time of S.D.W's birth and adoption, and Welker visited him there over one hundred times during the course of their relationship. She knew his home telephone number and his cell phone number, both of which remained unchanged for several years (though she changed her own). In short, if Welker had wanted to contact Johns, she easily could have done so.

Fourth, and perhaps most important, Welker actively concealed her pregnancy from Johns. Welker listed no father on the birth certificate, despite knowing that Johns is the biological father. Later, when asked by the adoption agency to provide the biological father's name on the "Affidavit of Parentage," she falsely put "Gregory Thomas James," rather than "Gregory Joseph Johns." She repeated that falsehood two weeks later when filling out the adoption agency's "Birth Father Information" form. Then, when Johns learned through rumor that Welker had been pregnant, she initially denied it to him as well. Only when he pressed her did she finally admit that he is, in fact, the biological father of S.D.W. In light of these facts, it is reasonable to doubt whether Welker would have told Johns about the pregnancy, even if he had questioned her about this subject following their breakup.

In sum, I cannot agree with the majority's characterization of "ample evidence." *In re S.D.W.*, ___ N.C. at ___, ___ S.E.2d at ___. I do not see how—when Welker told Johns she was using birth control, when she told him about a prior pregnancy, when she knew of this pregnancy but said nothing, and when she acted affirmatively to conceal S.D.W.'s existence from him–Johns had any meaningful opportunity to acquire notice of the fact that Welker was pregnant or had borne a child. Accordingly, I do not think the majority's opinion comports with the Supreme Court's holding in *Lehr* that biological fathers possess at least an inchoate interest in their biological offspring and must be afforded an opportunity to develop a relationship more substantial and enduring. *See Lehr*, 463 U.S. at 262, 103 S. Ct. at 2993, 77 L. Ed. 2d at 627.

For these reasons I conclude that the majority's opinion allowing the adoption to proceed without Johns's consent is not in harmony with the Supreme Court's opinion in *Lehr v. Robertson* and imposes unrealistic requirements on potential biological fathers. I would affirm the decision of the Court of Appeals remanding this matter to the trial court to obtain further information regarding the steps Johns actually took to "grasp[ ] th[e] opportunity" presented by the birth of S.D.W. *Id.* Accordingly, I respectfully dissent.

Justice HUDSON and Justice BEASLEY join in this dissenting opinion.