IN THE SUPREME COURT OF NORTH CAROLINA

No. 133A19

Filed 27 September 2019

IN THE MATTER OF A.U.D. and A.X.D.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 20 December 2018 by Judge Donald Cureton Jr. in District Court, Mecklenburg County. This matter was calendared in the Supreme Court on 11 September 2019 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Heyward Wall Law, P.A., by Heyward G. Wall, for petitioner-appellant Bethany Christian Services.*
>
> *Edward Eldred for respondent-appellee father.*

DAVIS, Justice.

This case involves a private termination of parental rights proceeding initiated by petitioner Bethany Christian Services (BCS) against respondent-father. In this appeal, we consider whether the trial court erred by declining to terminate respondent's parental rights to his children based on its determination that termination would not be in the best interests of the children. Because we conclude that the trial court's ruling was within its discretion, we affirm.

**Factual and Procedural Background**

Tanya[1] and respondent began a relationship in 2016, and Tanya became pregnant with twin girls, Amy and Ann (collectively, the children), shortly thereafter. The parties never married, and their relationship ended prior to the children's birth. In September 2016, Tanya falsely informed respondent that she had miscarried and ended contact with him. In January 2017, respondent encountered Tanya at the hospital where she worked and noticed that she appeared to be pregnant. However, respondent did not ask her about the pregnancy.

Respondent pled guilty to being a habitual felon in February 2017 after being convicted of assault with a deadly weapon with the intent to kill or inflict serious injury.[2] While incarcerated, respondent learned that Tanya was, in fact, pregnant and due to deliver in May 2017. In April 2017, respondent wrote to North Carolina Prisoner Legal Services for assistance in establishing paternity. Per its instructions, he attempted to submit a complaint and affidavit of parentage with Mecklenburg County Child Support Enforcement, but the documents were never actually filed with the clerk of court.

After the children's birth in May 2017, Tanya initially cared for them. In June 2017, however, she placed them in the care of Sarah, the children's maternal aunt. On 3 August 2017, Tanya relinquished her parental rights to the children to BCS, an adoption agency. Later that month, Tanya visited Sarah's home with two social

---

[1] Pseudonyms are used throughout this opinion to protect the identities of the juveniles and for ease of reading.

[2] Respondent has a projected release date of August 2021.

workers, who proceeded to take custody of the children. Shortly thereafter, Sarah obtained emergency custody of the children in District Court, Mecklenburg County. BCS filed a motion to intervene in the custody action and was awarded custody. BCS subsequently placed the children with a prospective adoptive family, where they have lived through the present date.

On 28 August 2017, BCS filed a petition to terminate respondent's parental rights in District Court, Wake County on the grounds of neglect, failure to legitimate, and dependency. *See* N.C.G.S. § 7B-1111(a)(1), (5), (6) (2017). Respondent then sought an adjudication of paternity and filed an answer to BCS's petition. The results of respondent's DNA test showed a 99.99% probability of paternity as to the children. Respondent also executed an affidavit of parentage. On 18 May 2018, the court entered an order declaring him to be the children's father. In August 2018, the court granted respondent's motion to change venue, and the termination of parental rights matter was moved to Mecklenburg County.

A hearing on the petition to terminate respondent's parental rights was held before the Honorable Donald Cureton Jr. on 7 December 2018 in District Court, Mecklenburg County. At the hearing, the trial court heard testimony from respondent, Tanya, Sarah, the children's guardian *ad litem*, and the prospective adoptive parents.

On 20 December 2018, the trial court entered an order in which it concluded that although a ground existed to terminate respondent's parental rights under

N.C.G.S. § 7B-1111(a)(5), termination was not in the best interests of the children. Accordingly, the trial court denied BCS's petition. BCS gave timely notice of appeal to this Court.

## Analysis

In this appeal, BCS argues that the trial court failed to make sufficient findings of fact in its 20 December 2018 order and abused its discretion when it determined that termination of respondent's parental rights was not in the best interests of the children. Our Juvenile Code provides for a two-stage process for the termination of parental rights—an adjudicatory stage and a dispositional stage. N.C.G.S. §§ 7B-1109, -1110 (2017). At the adjudicatory stage, the petitioner bears the burden of proving by "clear, cogent, and convincing evidence" the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes. N.C.G.S. § 7B-1109(f). We review a trial court's adjudication under N.C.G.S. § 7B-1109 "to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law." *In re Montgomery*, 311 N.C. 101, 111, 316 S.E.2d 246, 253 (1984) (citation omitted).

Here, the trial court determined that there was sufficient evidence presented to terminate respondent's parental rights pursuant to N.C.G.S. § 7B-1111(a)(5). Neither party has challenged this portion of the trial court's ruling, and this issue is therefore not before us.

If a trial court finds one or more grounds to terminate parental rights under N.C.G.S. § 7B-1111(a), it then proceeds to the dispositional stage. N.C.G.S. § 7B-1110(a) states, in pertinent part, as follows:

> After an adjudication that one or more grounds for terminating a parent's rights exist, the court shall determine whether terminating the parent's rights is in the juvenile's best interest . . . In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a).

The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion. *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re L.M.T.*, 367 N.C. 165, 171, 752 S.E.2d 453, 457 (2013); *In re Montgomery*, 311 N.C. at 110, 316 S.E.2d at 252). "[A]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re T.L.H.*, 368 N.C.

101, 107, 772 S.E.2d 451, 455 (2015) (citing *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)).

Here, the trial court made the following findings of fact regarding the statutory criteria set forth in N.C.G.S. § 7B-1110(a):

> 14. The twin girls were born May 5, 2017.
>
> . . . .
>
> 43. The children were placed with the PAF [prospective adoptive family] in October 2017. The children have lived with this family continuously, without interruption since that time.
>
> 44. The PAF consists of a father, mother, and 2 biological daughters, ages 8 and 5.
>
> . . . .
>
> 46. The PA [prospective adoptive] parents have completed transracial adoption training and have tried to make the home more culturally inclusive. Some examples are they have provided all the children in their home with black dolls and have placed culturally aware artwork in the home. Additionally, the PA mom has worked to educate church members on implicit bias.
>
> 47. The twins have a strong bond with the PAF, including extended family like the grandparents, aunts, uncles, and cousins – all of which live within 60 minutes of the PAF.
>
> 48. The PAF has participated in multiple activities with the twins including dancing with them, taking them "trick-or-treating," and taking them on family trips.
>
> 49. [Respondent] has 3 other children. He received custody of the oldest two kids. The oldest is with the child's mother after she fled the state and took the child with her immediately following [respondent] being awarded

emergency custody. The middle child was placed in his custody but [respondent] became incarcerated in prison for about 3 years on another unrelated offense shortly thereafter. [Respondent] has visitation rights to the youngest child.

50. [Respondent] is incarcerated at a minimum security prison. Since being incarcerated [respondent] has been engaged in self-improvement training. [Respondent] has successfully completed all the requirements in the cognitive behavioral intervention curriculum called "Thinking for A Change." Also, [respondent] received a passing grade and 4.5 continuing Education Units for "New Beginnings: Employment Skills for Former Offenders."

51. About one month ago, [respondent] began participating in the work release program. [Respondent] has been "infraction free" while in prison thus making him eligible for the program. Before work release [respondent] worked in the kitchen and made about $7 a week.

52. Presently, [respondent] makes $10 an hour. The money he makes goes into a trust account that he only has access to upon his release, or to pay for court ordered child support or to maintain household bills while he is still incarcerated.

53. [Respondent] would like for [Amy and Ann] to be placed with [Sarah]. He does not want his parental rights terminated. He does not have any paternal relatives he could recommend for placement of [the children].

54. [Sarah] is willing and able to provide placement for [Amy and Ann] until [respondent] is released from prison. She and her son reside in a very neat and tidy, two-bedroom apartment, but she plans to move into a three-bedroom apartment if the girls are placed with her. She is employed full-time as a nurse's assistant. . . . She earns about $3361 per month. Currently, she is in a relationship with an individual who was released from prison recently.

55. When [Amy and Ann] were placed with her, [Sarah] did a good job caring for [the children]. There is no evidence

that she did not or could not care for them.

. . . .

60. Although [Amy and Ann] were placed with the PAF in October 2017, it was done solely at the behest of the mother who relinquished her [parental] rights and chose the PAF specifically. [BCS] accepted the relinquishment knowing the whereabouts of [respondent] and without speaking with him. After speaking with [respondent] they chose not to return [Amy and Ann] to [Sarah] and there is no evidence they even spoke to her or conducted a home study of her home.

61. It is evident that [BCS] never had an intention of returning the children to [Sarah] or giving [respondent] an opportunity to parent [Amy and Ann] upon his release from prison.

62. Although it is clear [respondent] created the circumstances that led to his incarceration, it is also clear that [Tanya] and [BCS] created the circumstances that led to the girls living with the PAF for 14 months causing them to bond to the PAF substantially. They now seek to benefit from those same circumstances by arguing that it is in the best interest of [Amy and Ann] to remain with the PAF because of the substantial bond.

63. There is no doubt the PAF is taking adequate care of [Amy and Ann] but permanently severing the legal relationship between them and [respondent] and their biological relatives may not be in the best interest of [Amy and Ann] without further proof that such a relationship is truly unsafe or that [respondent] has in fact neglected [Amy and Ann]. Not only has [respondent] expressed a desire to parent [Amy and Ann] but he has proactively attempted to exercise that right through his diligent efforts to legally establish paternity and have [Sarah] gain legal custody.

64. It is not in the children's best interest to terminate the parental rights of [respondent].

BCS makes several arguments concerning the dispositional findings in the trial court's order. We first address BCS's contention that the trial court's written findings did not adhere to the findings orally rendered at the conclusion of the termination hearing. BCS asserts that the trial court made certain oral findings in its favor regarding the statutory factors set forth in N.C.G.S. § 7B-1110(a) but then omitted these findings from its written order.

Pursuant to Rule 58 of the North Carolina Rules of Civil Procedure, "a judgment is entered when it is reduced to writing, signed by the judge, and filed with the clerk of court." N.C.G.S. § 1A-1, Rule 58 (2017). As our Court of Appeals has correctly held, a trial court's oral findings are subject to change before the final written order is entered.[3] *See Morris v. Se. Orthopedics Sports Med. & Shoulder Ctr., P.A.*, 199 N.C. App. 425, 433, 681 S.E.2d 840, 846 ("The announcement of judgment in open court is the mere rendering of judgment, and is subject to change before entry of judgment." (citation and internal quotation marks omitted)), *disc. rev. denied*, 363 N.C. 745, 688 S.E.2d 456 (2009). Thus, we conclude that BCS has failed to show the existence of error based merely on the fact that there were differences between the findings orally rendered at the hearing and those set forth in the written order.

We next consider BCS's contention that the trial court did not make sufficient

_____

[3] Indeed, we observe that at the conclusion of the hearing, the trial court clearly indicated that it was still "contemplating" the evidence and that it intended to "mull" over the case before reaching a decision, thus making it clear to the parties that its findings were subject to change prior to final entry of judgment.

findings regarding the factors set forth in N.C.G.S. § 7B-1110(a). Specifically, BCS argues that the trial court improperly failed to make findings of fact concerning the likelihood of adoption; whether termination of respondent's parental rights would aid in the accomplishment of the permanent plan for the juveniles; and the bond between the juveniles and respondent. *See* N.C.G.S. § 7B-1110(a)(2), (3), (4).

It is clear that a trial court must *consider* all of the factors in section 7B-1110(a). Here, the transcript of the hearing demonstrates that the trial court did, in fact, carefully consider each of the statutory criteria listed in N.C.G.S. § 7B-1110(a). The statute does not, however, explicitly require written findings as to each factor. Although the better practice would have been for the trial court to make written findings as to the statutory factors identified by BCS, we are unable to say that the trial court's failure to do so under the unique circumstances of this case constitutes reversible error.[4]

First, there was no conflict in the evidence regarding the likelihood of adoption. Indeed, the sole purpose of the petition to terminate respondent's parental rights was so that Amy and Ann could be adopted by the prospective adoptive family. Second, it was undisputed that no bond existed between respondent and the children. Third, because this was a private termination proceeding, there was no "permanent plan"

---

[4] We do, however, take this opportunity to encourage trial courts to make written findings on all of the statutory factors set out in N.C.G.S. § 7B-1110(a) in the dispositional portions of orders ruling on petitions to terminate parental rights, so as to obviate arguments in future cases that a written finding was not made on a "relevant" factor under the statute.

for Amy and Ann within the meaning of N.C.G.S. § 7B-1110(a)(3). Accordingly, a remand by this Court to the trial court for written findings on these uncontested issues—a disposition for which our dissenting colleague appears to be advocating—would be an elevation of form over substance and would serve only to delay the final resolution of this matter for the children.

BCS also argues that the trial court erred in failing to give due consideration to the report of the children's guardian *ad litem* and her recommendation that respondent's parental rights be terminated. BCS contends that the guardian *ad litem*, once appointed, is the "eyes and ears of the court" and that the trial court should have relied at least in part on the report and testimony of the guardian *ad litem* in reaching its decision.

The trial court's order clearly states that it considered the report and testimony of the guardian *ad litem*. The court, however, was not bound by that recommendation. *See In re D.L.W.*, 368 N.C. at 843, 788 S.E.2d at 167–68 (stating that it is the trial judge's duty to consider all the evidence, pass upon the credibility of the witnesses, and determine the reasonable inferences to be drawn therefrom). Therefore, because the trial court possesses the authority to weigh all of the evidence, the mere fact that it elected not to follow the recommendation of the guardian *ad litem* does not

constitute error.[5]

Finally, BCS asserts that the trial court's refusal to terminate respondent's parental rights was an arbitrary and capricious decision and constitutes an abuse of discretion. We disagree.

Our Juvenile Code provides "procedures for the hearing of juvenile cases that assure fairness and equity and that protect the constitutional rights of juveniles and parents" and aims to "develop a disposition in each juvenile case that reflects consideration of the facts, the needs and limitations of the juvenile, and the strengths and weaknesses of the family." N.C.G.S. § 7B-100(1), (2) (2017). One of the stated policies of the Juvenile Code is to prevent "the unnecessary or inappropriate separation of juveniles from their parents." N.C.G.S. § 7B-100(4). However, although parents have a constitutionally protected interest in the care and custody of their children and should not be unnecessarily or inappropriately separated from their children, "the best interests of the juvenile are of paramount consideration by the court and . . . when it is not in the juvenile's best interest to be returned home, the juvenile will be placed in a safe, permanent home within a reasonable amount of time." N.C.G.S. § 7B-100(5); *see also In re Montgomery*, 311 N.C. at 109, 316 S.E.2d

---

[5] BCS also asserts in its brief that the trial court's decision not to terminate respondent's parental right was due to its "personal bias against [BCS], or perhaps adoption agencies in general." We decline, however, to review this claim. "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion . . . ." N.C. R. App. P. 10(a)(1). Here, BCS did not move for Judge Cureton to recuse himself from presiding over the case. Therefore, this issue was not preserved for our review.

at 251 ("[T]he fundamental principle underlying North Carolina's approach to controversies involving child . . . custody [is] that the best interest of the child is the polar star.").

Here, the trial court carefully weighed the competing goals of (1) preserving the ties between the children and their biological relatives; and (2) achieving permanence for the children as offered by their prospective adoptive family. In addition to the statutory factors set out in N.C.G.S. § 7B-1110(a)(1)–(5), the trial court also considered other relevant circumstances—as it was permitted to do under N.C.G.S. § 7B-1110(a)(6)—such as the fact that (1) Amy and Ann were relinquished to BCS solely at the behest of their mother; (2) respondent was never afforded the opportunity to parent Amy and Ann or provide for their care prior to their relinquishment; (3) upon learning of Amy and Ann's birth, respondent "proactively" attempted to establish paternity; (4) respondent desired that Sarah gain legal custody of the juveniles and Sarah was willing and able to provide a placement for Amy and Ann until respondent was released from incarceration; and (5) Sarah had previously cared for the juveniles and "did a good job" in doing so. The trial court further noted the strides in self-improvement that respondent had made during his incarceration.[6]

To be sure, evidence existed that would have supported a contrary decision.

---

[6] Oddly, despite acknowledging that the General Assembly has expressly authorized trial courts through N.C.G.S. § 7B-1110(a)(6) to also consider "[[a]ny relevant consideration" in addition to the factors enumerated in N.C.G.S. § 7B-1110(a)(1)–(5), the dissent then proceeds to take the trial court to task for doing just that.

But this Court lacks the authority to reweigh the evidence that was before the trial court. We are satisfied that the trial court's conclusion that termination of respondent's parental rights was not in the children's best interests was neither arbitrary nor manifestly unsupported by reason.[7] Our analysis must end there.

## Conclusion

For the reasons stated above, we affirm the 20 December 2018 order of the trial court denying BCS's petition to terminate respondent's parental rights.

AFFIRMED.

---

[7] Although the dissent asserts that the trial court erroneously focused its analysis on the best interests of *respondent*, the trial court expressly found that the termination of respondent's parental rights would not be in the best interests of the *children*.

Justice NEWBY dissenting.

The majority muddles the analysis between the adjudicatory stage and the dispositional stage of termination of parental rights proceedings, inappropriately considering fairness to the parent at a stage in the proceedings where the statutory mandate says the best interests of the children should control. The trial court used an unnaturally broad reading of the term "relevant" in the section 7B-1110(a)(6) catchall provision while ignoring the requirement that it make written findings on all statutorily mandated factors. *See* N.C.G.S. § 7B-1110(a) (2017). Because the majority upholds the trial court's misapplication of the relevant statute, these children will be removed from the parents with whom they have bonded. I respectfully dissent.

We review a trial court's decision of whether to terminate parental rights for abuse of discretion. *In re Z.L.W.*, 831 S.E.2d 62, 64 (N.C. 2019). A trial court's misapplication of the law is an abuse of discretion. *See Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047 (1996) (explaining that trial courts by definition abuse their discretion when they make errors of law). The trial court below abused its discretion because it misapplied the statutory scheme for terminating parental rights. At the dispositional stage, when the statute requires trial courts to consider only the children's interests, the trial court improperly weighed factors related to a parent's interest, which may only be considered at the adjudicatory stage. Further, the trial court did not make the required written findings on all relevant statutory

criteria under section 7B-1110(a) as it determined the best interests of the children.

The trial court and the majority rewrite the carefully crafted statutory scheme, where factors weighing in the father's favor are properly considered only at the adjudicatory stage, not the dispositional stage. This Court has held that North Carolina's statutory scheme adequately safeguards parents' rights. *See In re Adoption of S.D.W.*, 367 N.C. 386, 394, 758 S.E.2d 374, 380 (2014) (explaining that "North Carolina has adopted a statutory framework designed to protect both the interests of biological fathers in their children and the children's interest in prompt and certain adoption procedures."). In this case, respondent's interests are safeguarded by section 7B-1111(a) and the children's interests are safeguarded by section 7B-1110(a). *See* N.C.G.S. § 7B-1111(a) (2017). Section 7B-1111(a) controls the adjudicatory stage, when the court determines whether grounds exist, based on parents' behavior, to terminate parental rights. It is the only stage where a parent's interests are considered. There is no dispute that grounds existed under that provision to terminate respondent's parental rights. The adjudicatory stage is complete. The dispositional stage of the proceedings at issue here is controlled by section 7B-1110(a), which is governed by the best interests of the children.

Section 7B-1110(a) establishes criteria for courts to consider when determining whether it is in a child's best interests to terminate a party's parental rights. These criteria include: (1) the age of the juvenile; (2) the likelihood of adoption of the juvenile; (3) whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile; (4) the bond between the

juvenile and the parent; (5) the quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement; and (6) any relevant consideration. *Id.* At this stage, "any relevant consideration" is constrained to those factors affecting the best interests of the children. A trial court must consider each of these six criterion and must make written findings on all that are "relevant." *Id.*

The trial court appears to have mentioned each of the criteria listed in section 7B-1110(a), and, based on its own oral findings, every one of those criteria weighed in favor of terminating the father's parental rights. The majority seems to agree. The guardian *ad litem*, who is uniquely tasked with understanding and advocating for the children's best interests, also believed respondent's parental rights should be terminated. The trial court, however, ignored all this. In considering criterion (6), the catchall, the trial court packed its analysis with a number of legally irrelevant considerations, and allowed those to outweigh all else.

The trial court, in both its oral and written findings, emphasized the following: that the father never had the chance to develop a relationship with the children; that the father's failed paternity filing was not really his fault; and that the father had no say in the development of the relationship between the children and the prospective adoptive family. These considerations speak to whether terminating respondent's parental rights would be fair to him, not the best interests of the children.

Certainly section 7B-1110(a)(6) allows the court to consider "[a]ny relevant consideration." N.C.G.S. § 7B-1110(a)(6) (2017). But these three words should not be

-3-

read in a vacuum. Section 7B-1110(a) itself provides guidance. It explains that these criteria help courts determine whether terminating parental rights is in the *child's best interest*. N.C.G.S. § 7B-1110(a) (directing courts to "determine whether terminating the parent's rights is in the juvenile's best interest" by "consider[ing] the [six] criteria"). So, "[a]ny relevant consideration" includes only those criteria bearing on the children's interests, particularly when section 7B-1100(3) unambiguously elevates the children's interests above any conflicting ones of a parent in the proceedings. N.C.G.S. § 7B-1100(3) (2017) ("Action which is in the best interests of the juvenile should be taken in all cases where the interests of the juvenile and those of the juvenile's parents or other persons are in conflict.").

Some of the trial court's additional considerations do pass the relevance test under section 7B-1110(a). For example, the trial court noted that the children's aunt was willing and able to care for them. This consideration is relevant because it affects the quality of the children's lives if respondent's parental rights are not terminated.

But the aunt's willingness and capability alone fall far short of vindicating the trial court's misapplication of the statutory scheme. The trial court's ability to assess "[a]ny relevant consideration" allows some flexibility to examine the particulars of each of the many diverse cases that come before it. It does not, however, give courts unbridled discretion. Catchall provisions like this one should rarely, if ever, be powerful enough to control the outcome when every other specifically enumerated criterion would demand a different result. If it could, the General Assembly would have no need to list any criteria and could simply place the decision in the unbridled

-4-

discretion of the trial court. Instead, the General Assembly has created a statutory scheme that is much more precise. The trial court and the majority fail to properly apply that scheme.

Relatedly, the trial court abused its discretion by failing to make the required written findings on all "relevant" criteria under section 7B-1110(a). The majority incorrectly assumes that "relevant" criterion are only those that are contested in the particular case. That is incorrect. "Relevant" simply describes those criterion which influence the trial court's decision, even if the nature of the criteria are undisputed. *See Relevant, Black's Law Dictionary* (11th ed. 2019) (defining "relevant" as "[l]ogically connected and tending to prove or disprove a matter in issue; having appreciable probative value—that is, rationally tending to persuade people of the probability or possibility of some alleged fact").

In this case, criteria (1) through (5) are all relevant. The children are young, they are likely to be adopted, adoption is part of their permanent plan, there exists no bond between the children and respondent, and the children's relationship with the prospective adoptive parents is strong. In fact, the trial court identified all of these criteria in the way just described. Every one of those criteria bear on whether it would be in the children's best interests to terminate the father's parental rights—the only issue in this case.

But it appears that the trial court omitted written findings on three out of the five criteria. It found that the children are very young and that they have a strong relationship with the adoptive parents, but failed to make findings under (2), (3), and

(4). *See* N.C.G.S. § 7B-1110. The trial court thus failed to follow the controlling statute properly.

Though section 7B-1110(a) grants some discretion to trial courts, it immediately directs that discretion down a specific path. The trial court did not stay on that path. And on its detour, it diminished criteria it by statute must elevate. Whereas the dispositional phase should be guided by the children's best interests, here the majority's decision upholds the trial court's subjective consideration of the father's rights.

For these reasons, I respectfully dissent.